JUSTICE GABRIEL
delivered the Opinion of the Court.
¶1' This case concerns the scope of a trial court’s discretion to permit, deny, or restrict the jury’s access during deliberations to a DVD containing the recorded statement of a child sexual assault victim, which DVD was admitted as an exhibit in a criminal trial. The People challenge the decision of a unanimous division of the court of appeals, People v. Jefferson, 2014 COA 77M, — P.3d -, which concluded that the trial court had abused its discretion in granting the jury unrestricted access to such an exhibit and that the error required reversal and a new trial.[1] According to the People, the division misconstrued our precedent, including DeBella v. People, 233 P.3d 664 (Colo. 2010), and the trial court acted within the bounds of its discretion.
¶2 We are not persuaded. Instead, we agree with the division that the trial court did not employ the requisite caution to ensure that the DVD would not be used in such a manner as to create a likelihood that the jury would accord it undue weight or emphasis. Specifically, the trial court relied on the court of appeals division’s analysis in People v. DeBella, 219 P.3d 390, 396-97 (Colo. App. 2009), rev'd, 233 P.3d 664 (Colo. 2010), but this court reversed the decision in that case. By relying on an analysis that this court later rejected, the trial court thus misapplied the law and abused its discretion. Moreover, because the nature of the DVD and its importance to the ease’s resolution leave us with grave doubts as to the effect that unfettered access had on the verdict and the fairness of the proceedings, we cannot deem the error harmless.
¶3 Accordingly, we affirm the judgment of the court of appeals and remand the case to that court for further proceedings consistent with this opinion.
I. Facts and Procedural History
¶4 In May 2007, the victim, then-three-year-old J.B., moved to Denver with her mother and older brother. Dherl Jefferson befriended the children’s mother that summer, after which J.B. and her brother occasionally spent time at Jefferson’s apartment playing video games and watching movies. The children called Jefferson “Uncle Dherl,” and he helped the family financially from time to time. He also babysat the children “about four times” between early 2008 and March 2009. On these occasions, the children’s mother would drop them off at Jefferson’s apartment at 5:30 or 6 p.m. and then pick them up between midnight and 2 a.m. On two occasions, however, the children spent the night at Jefferson’s apartment.
¶5 On March 9, 2009, J.B. disclosed to her mother that “Uncle Dherl” had “touched her in a bad way.” Her mother asked whether this had happened more than once, and J.B. replied, “Yeah, every time we’re over there.” Her mother called the police.
¶6 The next day, J.B. repeated her allegations in more detail to a forensic interviewer. The police then arrested Jefferson, and the People charged him with, as pertinent here, one count of sexual assault on a child (with a pattem-of-abuse sentence enhancer) and one count of sexual assault on a child by one in a position of trust.
*496 ¶7 Jefferson pleaded not guilty, and his case proceeded to trial. The jury, however, deadlocked, and the court declared a mistrial. The prosecution then decided to re-try Jefferson. This case concerns the second trial, which took place in 2011, more than two years after the abuse had allegedly occurred.
¶8 At trial, then-seven-year-old J.B. could not recall many details about the alleged abuse. The prosecution’s case against Jefferson thus hinged on the DVD of J.B.’s forensic interview and on the hearsay testimony of the forensic interviewer and of J.B.’s mother and brother.
¶9 As pertinent here, after the forensic interviewer had laid a foundation for the admission of the DVD of J.B.’s interview, the prosecutor moved to admit it. Jefferson’s counsel acknowledged that the DVD was admissible under the statutory hearsay exception for statements of child sexual assault victims, section 13-25-129, C.R.S. (2016), and he stated that he had “no objection to [its] being played for the jury.” He objected, however, to the DVD’s “being admitted as an exhibit for the jury to consider over and over and over.” Asked to clarify the basis for his objection, counsel explained that permitting jurors “to have possession” of the DVD would be “improper and would allow repetition [and] undue emphasis.”
¶10 The court overruled the objection, admitted the DVD as an exhibit,. and stated that it would allow the jury to review the DVD if and when a juror asked to do so. In so ruling, however, the court did not opine as to whether the jury would have unfettered access to the DVD. To the contrary, the court specifically left that question open and instructed Jefferson to re-raise his objection at the end of the trial, when the court would be able to consider all of the evidence presented and “make [the] particularized finding” required by “the DeBeila case.” At that time, the court would determine whether, “in [its] discretion,” (1) the jury’s review of the DVD needed to be supervised (i.e., the jury would need to request access to the DVD) or (2) the jury would “be allowed unsupervised access” to the DVD.
¶11 The prosecutor then played the forty-five-minute DVD for the jury. During the recorded interview, the forensic interviewer asked mostly open-ended questions, beginning with whether “something” had happened. J.B. explained that while she slept on “Uncle Dherl’s” couch, he took her into his room and “d[id] that nasty stuff’ to her. With J.B.’s input, the interviewer drew diagrams of Jefferson’s living room, where J.B. had slept on the couch, and Jefferson’s bedroom, where J.B. said Jefferson did “the stuff’ to her. When the forensic interviewer asked J.B. to describe “the stuff,” she replied that Jefferson “pulled down [her] panties” and then “rub[bed] [her] bottom” with his hand. She also said that “he turned [her] straight” on her back, got “on top of [her],” and did “sex stuff to her.” When asked to clarify, she said that he “humped” her. The forensic interviewer then asked J.B. several questions about how Jefferson had “humped” her, and J.B. explained that he sat on her and moved his body “up and down.” Asked how this made her body feel, she answered, ‘Wiggly.” After further questioning, J.B. explained that Jefferson “kind of squishfed]” her “va-jj” (i.e., her vagina) and made her body feel “mad.” She was not sure exactly how often Jefferson had touched her, stating at first that it was “two times, I think. Or four” and later that it was “more than one time.”
¶12 After the jurors watched the recording of J.B.’s forensic interview, the court admonished:
Ladies and gentlemen, in this case you just heard an out-of-court statement by [J.B.], which has been admitted into evidence. You’re instructed that it’s for you to determine the weight and credit to be given these statements.
In making this determination, you shall consider the age and maturity of the child, the nature of the statements, the circumstances under which the statements were made, and any other evidence which will be admitted in the trial which you choose' to consider for that purpose.
1Í13 The forensic interviewer then finished testifying, and J.B, took the witness stand. With leading questions, the prosecutor prompted J.B. to agree that “[something bad happened when [she] spent the night at *497 [her] Uncle Dherl’s house.” When asked about the details of the allegations, however, J.B. often answered with “I don’t know” or “I don’t remember.” She could not remember, for example, whether Jefferson had used his wheelchair when he carried her into his room. She did remember, however, that once they were in his room, Jefferson had put her on his bed, “pulled down [her] panties,” and “started rubbing [her] butt,” On a body diagram, J.B. then circled her “butt.” She did not remember whether he had touched her anywhere else that night or whether he had touched her again on a separate occasion. When, however, the prosecutor showed her a second body diagram and asked “where [her] Uncle Dherl’s body touched her” when he was sitting on top of her, J.B. circled what she called her “pee-pee.” She remembered telling the forensic interviewer that the incident had made her body feel “wiggly,” but she could not explain what that meant.
¶14 The next day, which was the last day of the trial, the court revisited the question of whether to allow the jury unsupervised access to the DVD of J.B.’s forensic interview, as it had said it would do. The court noted that the case law, including “the [DeBella] case”[2] and Frasco v. People, 165 P.3d 701 (Colo. 2007), required it to exercise its discretion and to consider certain “factors concerning why the DVD should go to the jury in an unsupervised way.” In the court’s view, the DeBella factors included (1) “whether or not the videotape was admitted as an exhibit and played for the jury in open court during the trial,” (2) “whether inculpa-tory evidence was introduced at trial in addition to the videotape,” and (3) “whether the jury was allowed to take notes which would preserve trial testimony in note form.”[3] The court found that all three factors were present, concluded that each one weighed in favor of unsupervised access, and noted that it was exercising its discretion to allow the jury unsupervised access to the DVD in the jury room.
¶15 Jury instructions and closing arguments followed, and J.B.’s forensic interview played an important role in the arguments. The People used J.B.’s recorded words to prove the allegations against Jefferson, and Jefferson argued that the interview was suggestive and that its contents were inconsistent with J.B.’s trial testimony. During her rebuttal argument, the prosecutor then told the jury:
[T]he [DVD] is part of evidence [sic]. And if you want to review it again, you certainly can do so in the jury room. And then you can review it and decide for yourself. And I’m not going to argue about what was said or was not said in the [DVD].[4]
¶16 After the arguments, the court excused the jury to deliberate. About four hours later, the jury returned with a verdict, finding Jefferson guilty of one count of sexual assault on a child and one count of sexual assault on a child by one in a position of trust. The jury further found, however, that the prosecution had not proved beyond a reasonable doubt that Jefferson had committed the sexual assault as part of a pattern of abuse. The court entered a judgment of conviction and, at the subsequent sentencing hearing, imposed an indeterminate prison term of ten years to life with lifetime mandatory parole.
¶17 Jefferson appealed, arguing that the trial court had reversibly erred in giving the jury “unrestricted and unsupervised access” during deliberations to the DVD of J.B.’s forensic interview. Jefferson, ¶ 8. The division ultimately agreed, concluding that although the trial court had affirmatively exercised its discretion when it decided not to exercise control over the jury’s access to the DVD, the court had abused that discretion by relying on the factors outlined in the court of appeals division’s opinion in DeBella, 219 *498 P.3d at 396-97. Jefferson, ¶ 16. The division viewed the pertinence of the factors discussed by the DeBella division as “at best, unclear,” given that this court later reversed the division’s decision. Id.; see DeBella, 233 P.3d at 668.[5]
¶18 Nor did the division deem the factors on which the trial court had relied persuasive on them merits. It regarded two of the factors—(1) that the DVD had already been admitted into evidence and played in open court and (2) that the jury had been allowed to take notes—as “insufficient to support a reasonable conclusion that the trial court need not control the jury’s access” to the DVD. Jefferson, ¶¶ 20-23. The division considered the third factor—the existence of other incriminating evidence—irrelevant to the question of juror access and salient only “to whether any error in refusing to restrict such access was harmless or reversible.” Id. at ¶ 24.
¶19 In light of the foregoing, the division concluded that the tidal court should have exercised “some form of control over the jury’s access to, or consideration of, the victim’s videotaped statements.” Id. at ¶ 18. The division suggested, for example, that the trial court might have (1) replayed the DVD for the jury in open court under the supervision of court personnel, (2) instructed the jury to watch the DVD no more than a specific number of times, or (3) instructed the jury not to give any special weight to the DVD. Id. at ¶ 19.
¶20 The division further concluded that the trial court’s error was not harmless because it cast “grave doubt” on the verdict or the fairness of the proceedings. Id. at ¶¶ 25-26. In so ruling, the division specifically noted that, like the videotape in DeBella, the DVD of J.B.’s interview had played a “gap-filling role,” supplying details of the assault that had been missing from J.B.’s testimony. Id. at ¶ 29. The division thus reversed the judgment of conviction and remanded the case for a new trial. Id. at ¶ 38.
¶21 The People petitioned for certiorari, and we granted the petition to consider their argument that the division misinterpreted our precedent by requiring a trial court to impose restrictions on the jury’s access to witnesses’ videotaped statements during deliberations.
¶22 We begin by clarifying the issue now before us. We then address the applicable standard of review. Finally, we proceed to discuss the merits of the People’s challenge.
II. The Issue Now Before Us
¶23 As an initial matter, we note that the People characterized the question before us as whether the division had erroneously expanded DeBella to require actual restrictions on a jury’s access to testimonial electronic exhibits, rather than a ease-by-case analysis of whether restrictions are appropriate. This recitation, however, misstates the division’s holding. Specifically, notwithstanding the People’s argument to the contrary, the division did not require actual restrictions on jury access to electronically recorded exhibits. Nor did the division expand DeBella. Rather, as set forth above, the division perceived an abuse of discretion under DeBella because the trial court had relied on factors that, in the division’s view, did not alleviate the risk that the jurors would give the DVD at issue undue weight.
¶24 Accordingly, we view the question presented as whether the trial court abused its discretion in allowing the jurors unfettered access during deliberations to the DVD at issue.
III. Standard of Review
¶25 Control over the use of exhibits during jury deliberations rests firmly within the trial court’s discretion, and we may not substitute our own judgment for that of the trial court merely because we would have reached a different conclusion. DeBella, 233 P.3d at 666-67. Accordingly, we will not disturb the court’s refusal to exclude or limit the use of an exhibit unless the court’s deci *499 sion was manifestly arbitrary, unreasonable, or unfair. See id at 667. In affording discretion to a trial court, however, an appellate court may not abdicate its responsibility,to review the trial court’s determinations. See Morgan v. People, 624 P.2d 1331, 1332 (Colo. 1981) (explaining, in the context of evaluating the competency of potential jurors, that placing discretion in the trial judge does not permit appellate courts “to abdicate their responsibility to ensure that the requirements of fairness are fulfilled”); accord Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (“Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review.”). A trial court abuses its discretion when it misapplies the law. See Antero Res. Corp. v. Strudley, 2015 CO 26, ¶ 14, 347 P.3d 149, 154.
¶26 Not every abuse of discretion, however, impairs the reliability of a conviction to a degree that requires reversal. DeBella, 233 P.3d at 667. Pursuant to Crim. P. 52(a), “[a]ny error, defect, irregularity, or variance which does not affect substantial rights” is deemed harmless and “shall be disregarded.” Thus, when a defendant objects to and preserves a non-constitutional trial error, the reviewing court will overturn his or her conviction only “if the error ‘substantially influenced the verdict or affected the fairness of the trial proceedings.’ ” Hagos v. People, 2012 CO 63, ¶ 12, 288 P.3d 116, 119 (quoting Tevlin v. People, 715 P.2d 338, 342 (Colo. 1986)).
¶27 Here, the parties agree that Jefferson’s initial objection preserved the issue for harmless error review, and we address the question presented with that understanding.
IV. Analysis
¶28 We begin our analysis by discussing the applicable standards governing jury access to videotaped witness statements during deliberations. We then apply those standards to the circumstances of this case to determine whether the trial court’s decision to grant the jury unfettered access to the DVD of J.B.’s forensic interview during deliberations constituted an abuse of discretion and, if so, what remedy is appropriate to redress the error. See DeBella, 233 P.3d at 667.
A. Jury Access to Videotaped Witness Statements
¶29 “In this jurisdiction we have long adhered to the rule that absent a specific exclusion of some particular class of exhibits, trial courts exercise discretionary control over jury access to trial exhibits during their deliberations.” Frasco, 165 P.3d at 704.
¶30 We most recently considered a trial court’s exercise of discretionary control over a child sexual assault victim’s videotaped statements in DeBella, 233 P.3d at 665-69. We discuss DeBella in some detail because it controls our disposition of this case.
¶31 In DeBella, the People charged the defendant with sexual assault on a child and enticement, See id. at 665, The evidence at trial included two videotaped interviews in which the victim had described the incidents underlying the charges to a detective and to a counselor. Id, Parts of the first videotape and all of the second were ultimately admitted into evidence and played for the jury in open court. Id. At the close of the evidence, the court announced that it intended to provide the jury with a television and the second videotape, thus allowing the jury unconstrained access to the second videotape during deliberations. Id at 665-66. The court decided not to provide the first tape because it had not been redacted and 'thus contained portions of the interview that the court had ruled inadmissible. Id. at 666.
¶32 Defense counsel objected to the court’s plan, contending that unless the court imposed restrictions on the jury’s access to the second videotape, the jury’s ability to review the videotape might result in undue prejudice to the defendant. Id. The court overruled this objection, relying on People v. McKinney, 80 P.3d 823, 829 (Colo. App. 2003), rev’d, 99 P.3d 1038 (Colo. 2004), in which the division had stated that pursuant to the amended C.R.C.P. 47(m), a basis no longer existed for prohibiting juror access during deliberations unless such access would be “infeasible.” DeBella, 233 P.3d at 666 (quoting McKinney, 80 P.3d at 829).
*500 ¶33 The jury eventually found the defendant guilty as charged, and he appealed, arguing, as pertinent here, that the trial court had committed reversible error when it allowed the jury, during deliberations, unfettered access to the videotape. See DeBella, 219 P.3d at 392. Before his conviction was final, this court issued its decision in Frasco, 165 P.3d at 704, disapproving of the application of C.R.C.P. 47(m) to exhibits in criminal proceedings and clarifying that “control over the use of exhibits during jury deliberations in criminal pi'oceedings must remain firmly within the discretion of the [trial] court.” The DeBella division acknowledged that Frasco controlled and, applying Frasco’s reasoning to the case before it, affirmed. DeBella, 219 P.3d at 393-97.
¶34 In reaching this conclusion, the division determined, as pertinent here, that the trial court’s decision to allow the jury unfettered access to the videotape did not unfairly prejudice DeBella because (1) the videotape was admitted as an exhibit and played for the jury in open court during the trial, “thus reducing the likelihood that the jury would place undue weight on it”; (2) the prosecution introduced “significant inculpatory evidence” at trial in addition to the videotape; and (3) the court permitted the jury to take notes, and the jury might have placed greater emphasis during its deliberations on testimony preserved in note form. Id. at 396-97.
¶35 We granted certiorari and reversed. See DeBella, 233 P.3d at 665.
¶36 We began by noting that Frasco had not announced a new rule of law but rather had reaffirmed this court’s decision in Settle v. People, 180 Colo. 262, 504 P.2d 680, 680-81 (1972), in which we had established that trial courts x’etain discretionary control over jury access to trial exhibits. See DeBella, 233 P.3d at 666. We thus viewed the question then before us as requiring us to decide whether the trial court had abused its discretion in providing the jury with unfettered access to the videotape during deliberations. See id. at 665.
¶37 In addressing this question, we observed that because the trial court felt bound by 'McKinney, “it thought its hands [were] tied with regard to the jury’s access to the tape.” Id. at 668. As a result, we concluded that the trial court had made no determination as to whether unfettered access to the videotape at issue would prejudice the defendant and, thus, the court had abused its discretion. Id. at 667-68.
¶38 Turning to the appropriate remedy, we concluded that the trial court’s abuse of discretion was not harmless and warranted reversal of the defendant’s conviction. See id. at 668. We based this conclusion on the facts that (1) the trial court’s failure to exercise some control over the jury’s access to the videotape or to specify why such control was unnecessary left us with no record as to how—or even if—the jury reviewed the tape during deliberations; (2) the “nearly silent record” prevented us from determining whether the trial court had fulfilled its obligation to “observe caution” that the videotape was not used in such a manner as to create a likelihood of the jury’s giving it undue weight or emphasis; (3) “the videotape was the linchpin of the prosecution’s case” because it was the only complete recounting of the charged assaults; and (4) because the victim’s testimony deviated from his videotaped statement, the inconsistencies “underscore[d] how central the victim’s credibility was to the resolution of the trial, thus heightening the danger of providing the jury with unchaperoned access to only one side of the story.” Id. at 668-69.
B. Application
¶39 Having set forth the governing legal principles, we now assess the People’s contention that the division erred in concluding that the jury’s unencumbered access to the DVD of J.B.’s forensic interview during its delibei’ations constituted l-evei’sible error. We first consider whether the trial court abused its discretion. Concluding that it did, we then discuss the appropiiate remedy.
1. Abuse of Discretion
¶40 The People contend that the tidal court undei'stood the scope of its disei-etion and properly exercised that disci'etion “by balancing competing interests” and determining that l’esti’ictions on the use of the DVD *501 during deliberations were unnecessary. We disagree.
¶41 Although the record confirms that the trial court understood its duty “to exercise discretion in making [its] findings,” the factors that the court ultimately took into consideration do not support the conclusion that it fulfilled its responsibility to guard against unfair or prejudicial use of the DVD by the jury. See DeBella, 233 P.3d at 666; Frasco, 165 P.3d at 703; Settle, 504 P.2d at 680-81.
¶42 As noted above, the trial court culled the factors on which it relied from the court of appeals division’s opinion in DeBella, 219 P.3d at 396-97, which opinion we later reversed. These factors included (1) the fact that “the [DVD] was admitted as an exhibit and played for the jury in open court during the trial”; (2) the existence of inculpatory evidence in addition to the DVD, namely, the testimony of J.B. herself and of three hearsay witnesses (the forensic interviewer and J.B.’s mother and brother), all of whom corroborated J.B.’s outcry statements; and (3) the preservation of trial testimony in the form of the jurors’ notes, which they could review in the jury room. In our view, however, none of these factors pertained to the trial court’s “ultimate objective” of assessing whether the jury’s use of the DVD during deliberations might have unfairly prejudiced Jefferson. See Frasco, 165 P.3d at 704-05. We address each factor in turn.
¶43 First, an exhibit’s admission into evidence occurs in every ease that raises the issue of unsupervised access by the jury. If the court does not admit an exhibit, then it would not go to the jury room and no question of unsupervised access would arise. Cf. People v. Harlan, 109 P.3d 616, 624 (Colo. 2005) (“[A]ny information that is not properly received into evidence or included in the court’s instructions is extraneous to the case and improper for juror consideration.”). We thus agree with the division below that neither the admission of the DVD nor its broadcast during trial alleviated the risk that the jury might place undue weight on the exhibit if allowed unrestricted access to it. See Jefferson, ¶ 20 (“[T]he jury’s ability to access (and particularly, to have unrestricted and unsupervised access to) an exhibit after it has been admitted and used before the jury in open court creates the danger of its being given undue weight or emphasis, within the meaning of Frasco and DeBella[.]”).
¶44 Second, we disagree with the trial court’s analysis of the non-video evidence against Jefferson. Importantly for the trial court, J.B. herself testified, several hearsay witnesses corroborated her outcry, and all of these witnesses were subject to cross-examination by the defense. The statutory hearsay exception for the statements of child sexual assault victims, however, when read together with the Confrontation Clause, effectively required J.B. to testify as a prerequisite to the admission of her out-of-court statements. See § 13—25—129(l)(b)(I); People v. Moreno, 160 P.3d 242, 246 (Colo. 2007). Accordingly, the fact that J.B. testified at trial was not particularly pertinent to a proper assessment of the risk that the jury would place undue emphasis on the DVD of her forensic interview.
¶45 Moreover, by repeating what they had heard J.B. say outside of court, the hearsay witnesses only highlighted the inconsistencies between J.B.’s in-court and recorded statements, thereby underscoring the critical nature of J.B.’s credibility to the resolution of the case. See DeBella, 233 P.3d at 669 (“[T]he inconsistencies between the victim’s recorded and trial accounts of the incidents— almost always present in cases such as these—underscore how central the victim’s credibility was to the resolution of the trial, thus heightening the danger of providing the jury with unchaperoned access to only one side of the story.”). Thus, rather than alleviating the risk that the jury might unduly emphasize J.B.’s recorded forensic interview—which effectively placed J.B. in the jury room during deliberations, see United States v. Binder, 769 F.2d 595, 600 (9th Cir. 1985) (noting that videotaped testimony “serves as the functional equivalent of a live witness”), overruled in part on other grounds by United States v. Morales, 108 F.3d 1031, 1035 n.1 (9th Cir. 1997)—the hearsay witnesses’ testimony likely had the opposite effect.
*502 ¶46 Third, the jurors’ ability to take notes was immaterial. Although one of the arguments against note-taking is that jurors may attach too much significance to their written notes and too little to their independent memory of events, see United States v. Maclean. 578 F.2d 64, 66 (3d Cir. 1978), this potential danger does not alleviate the risk that jurors may place undue significance on a videotaped exhibit. This is particularly true here, given that the trial court did not warn the jury against placing more significance on the DVD than on other evidence.
¶47 Moreover, videotaped exhibits differ ip. important respects from juror notes. As the trial court stated in its initial remarks to the jury, the jury was required to decide the case “only on the evidence presented at trial.” Although the DVD constituted such evidence, the jurors’ notes did not. And as the division below explained, the jurors’ independent recollections would not prevail over their review of the DVD itself, which was “the equivalent of allowing a witness (not, as in the case of a juror, an impartial decision maker) into the jury room.” Jefferson, ¶ 21.
¶48 Lastly, we note that all of the factors on which the trial court relied are virtually ubiquitous in cases like the present one. Specifically, although the decision to allow juror note-taking is discretionary, see Billings v. People, 171 Colo. 236, 466 P.2d 474, 478 (1970), trial courts are encouraged to permit jurors to take notes in criminal trials, see ABA Standards for Criminal Justice § 15-3.5 (“During the trial of the case, the jurors should be permitted to make notes and keep these notes with them when they retire for their deliberations.”); see also COLJI-Crim. B:04 (2016) (pattern criminal jury instruction indicating that jurors may take notes during a trial). Similarly, for the issue of jury access to a child-victim’s prior videotaped statement to arise, two things have likely occurred: (1) the trial court admitted the videotaped statement as an exhibit, allowing the party offering the evidence to play it for the jury in open court, and (2) the court likely did so through section 13-25-129, which, as noted above, effectively requires the child-victim to testify at trial. See § 13—25—129(l)(b)(I); Moreno, 160 P.3d at 246.
¶49 For these reasons, a court that measures the potential for undue emphasis by asking whether (1) the videotape was admitted, (2) additional inculpatory evidence (such as the child-victim’s trial testimony) was presented, and (3) the jury was allowed to take notes is likely to find all three factors present, regardless of the risk actually presented by giving the jury unfettered access to the recorded statement.
¶50 We are not persuaded otherwise by the People’s argument that by granting the jury unrestricted access to the DVD at issue, the trial court implicitly found that the evidence was not unduly prejudicial. The People advanced a similar, though more nuanced, contention in DeBella, 233 P.3d at 667, arguing that the court’s decision to withhold access to one videotape while granting unrestricted access to a second demonstrated “a deliberate calculation in light of all attendant circumstances.” We rejected this argument, however, because the trial court’s different treatment of the two videotapes had, in fact, depended on the feasibility (or infeasibility) of providing each to the jury, not on an assessment of the likelihood of prejudice. See id.
¶51 The trial court’s ruling in the present case similarly overlooked the aspects of the case that suggested a likelihood of unfair prejudice. We thus are compelled to reach the same conclusion that we reached in De-Bella, namely, that the trial court did not properly exercise its discretion in granting the jury unrestricted access to the DVD at issue. The inference that the People urge us to make requires us simply to assume that the trial court had made findings that supported its decision. Such an assumption, however, would effectively defeat our review for any abuse of discretion.
¶52 We likewise are unpersuaded by the People’s argument that in assessing the risk of undue emphasis, the division substituted its own judgment for that of the trial court. As the division recognized, in applying the abuse-of-discretion standard to a trial court’s ruling, “[a]n appellate court may not assign error to [the] trial court merely because it would have reached a different conclusion.” See Jefferson, ¶ 13 (quoting DeBel *503 la, 233 P.3d at 667). Here, however, the division concluded that in refusing to restrict the jury’s use of the DVD, the trial court had relied on an erroneous understanding of the applicable law and therefore abused its discretion. Such a ruling did not usurp the trial court’s authority to act within the bounds of its discretion. See Antero Res. Corp., ¶ 14, 347 P.3d at 154; Morgan, 624 P.2d at 1332.
¶53 Accordingly, like the division below, we conclude that the trial court abused its discretion in granting the jury unfettered access to the DVD of J.B.’s out-of-court statement.
2. Remedy
¶54 The question remains whether reversal is required! As noted above, not all abuses of discretion warrant reversal. DeBella, 233 P.3d at 667. Under the harmless error standard, we will not overturn the jury’s guilty verdict unless (1) the record shows that the erroneous ruling substantially influenced the jury’s verdict or affected the fairness of Jefferson’s trial, see Hagos, ¶ 12, 288 P.3d at 119, or (2) we are left with grave doubt as to the ruling’s effect, see Kotteakos v. United States, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) (explaining that an error cannot be harmless if, among other things, “after pondering all that happened without stripping the erroneous action from the whole,” the court “is left in grave doubt” as to whether the error substantially swayed the verdict).
¶55 Here, unlike in DeBella, 233 P.3d at 669, the record contains the trial court’s explanation as to why it chose to give the jury unfettered access to the DVD of J.B.’s interview and why, in the court’s view, the jury was unlikely to give undue emphasis to that DVD if granted such access. After viewing the record as a whole, however, we are left with the same grave doubts that the DeBella court had regarding the effect of unfettered access on the verdict and the fairness of the proceedings. See id.; see also Kotteakos, 328 U.S. at 765, 66 S.Ct. 1239.
¶56 Like the tidal court in DeBella, the trial court in this case did not (1) give a limiting instruction cautioning the jury against according the DVD any more significance than the other evidence, cf. Frasco, 165 P.3d at 702 (noting that the trial court had given such an instruction), or. (2) wait for a jury request to review the DVD, e£ id. (noting that the trial court there had done so). Either of these measures, if undertaken by the trial court, could have mitigated the risk of unfair prejudice from unfettered access to the DVD in the jury room because, had the trial court taken either action, we could have presumed that the jury followed the limiting instruction, or we could have inferred from the jury’s request that the jurors had actually reviewed the DVD. DeBella, 233 P.3d at 668.
¶57 The trial court also had the discretion to craft alternative mitigation procedures. See id. at 669. For example, it could have instructed the jury not to watch the DVD more than a certain number of times or required the jury to view the DVD either in open court or under a bailiff’s supervision, Id. Absent any of these or similar measures, however, we are unable to evaluate how—or even whether—the jury reviewed the DVD during its deliberations. :Cf. id. at 668.
¶58 And although the trial court here attempted to address the risk of undue prejudice in overruling Jefferson’s objection to unfettered jury access to the DVD, as noted above, its analysis relied on factors that did not accurately measure the potential for unfair prejudice. Accordingly, the fact that the court exercised its discretion does not allay our doubts regarding the effect of unfettered access to the DVD on the verdict or the fairness of the proceedings.
¶59 The nature of the DVD and the significant role that it played in Jefferson’s trial only exacerbate our concerns regarding the verdict and the fairness of the proceedings. Like the. defense in DeBella, Jefferson’s principal theory at trial was that J.B.’s abuse allegations were not credible. See id. at 669, Moreover, the prosecution introduced no physical evidence of the crime. Rather-, its case rested on J.B.’s allegations, which were at times inconsistent and which were supported only by hearsay testimony from her family and government investigators. J.B.’s credibility, (or lack thereof) thus -became a crucial issue at trial, and the DVD, which *504 contained details that J.B. could not remember when she testified, likely served as the “linchpin of the prosecution’s case,” just as the videotape in DeBella did. See id.; cf. Binder, 769 F.2d at 600-01 (concluding that the child-victims’ videotaped testimony may have taken on “great significance” in the jury room because no physical evidence existed and the defendant challenged the child-victims’ credibility by asserting that them charges against him were vindictive). We thus agree with the division below that under these circumstances, the DVD of J.B.’s interview, which contained perhaps the most complete recounting of the alleged abuse, filled the gaps in her trial testimony. See Jefferson, ¶ 29.
¶60 With unfettered access to the DVD during its deliberations, the jury was able to watch and re-watch J.B. describe the abuse in a manner functionally equivalent to her live testimony, except with more—and more vivid—detail. Cf. State v. Michaels, 264 N.J.Super. 679, 625 A.2d 489, 524 (N.J. Super. Ct. App. Div. 1993) (“The witness’ words and all of the animation, passion, or sympathy originally conveyed are again presented to the jury.”), aff'd, 136 N.J. 299, 642 A.2d 1372 (1994). Further, during her rebuttal closing argument, the prosecutor told the jurors to review the DVD and decide for themselves. As a result, the jury is more likely to have followed the prosecutor’s suggestion, thereby placing undue emphasis on the DVD. And 'given the inconsistencies between J.B.’s recorded statement and her trial testimony, as well as the dearth of physical evidence, we believe that the likelihood of such undue emphasis substantially influenced the verdict and the fairness of the proceedings against Jefferson.
.¶61 We are not persuaded otherwise by the People’s argument that the brevity of the jury’s deliberations rendered any error harmless. The jurors deliberated for approximately four hours, which afforded them ample time to watch the forty-five-minute DVD (or at least pertinent portions of it) “over and over and over” (in the words of defense counsel). Cf. Summage v. State, 248 Ga.App. 559, 546 S.E.2d 910, 913 (2001) (concluding that an erroneous decision to allow the victim’s videotaped interview into the jury room was harmful because, among other things, “[t]he jurors had access to the forty-five-minute tape, arguably the most important evidence introduced by the State, for more than five hours before they reached a verdict”). In any event, as we said in DeBella, 233 P.3d at 668, “[wjhere holes in the record [e.g., the absence of evidence regarding whether the jury actually watched the DVD] are the result of the trial court’s error and pertinent inquiries on appeal are reduced to exercises in speculation, the lack of record support should not weigh against the defendant’s interests.”
¶62 Accordingly, we conclude that the error here was not harmless and that it requires the reversal of Jefferson’s convictions and a remand for a new trial.
V. Conclusion
¶63 For these reasons, we affirm the judgment of the court of appeals and remand this case to that court for further proceedings consistent with this opinion.
JUSTICE BOATRIGHT dissents.

. Specifically, we granted certiorari to review the following issue:
Whether the court of appeals erroneously expanded the scope of DeBella v. People, 233 P.3d 664 (Colo. 2010), to require actual restrictions on a jury's access to testimonial electronic exhibits rather than a case-by-case analysis of whether restrictions are appropriate.

. The transcript reads "Davila,'' but it is clear from context that the court meant "DeBella'' and either misspoke or was mistranscribed.

. These are the factors that the court of appeals division had relied on in DeBella, 219 P.3d at 396-97.

.Consistent with the trial prosecutor’s suggestion that the jurors watch the DVDs again in the jury room, the People have not asserted in this case that the jurors lacked the equipment necessary to take advantage of the unfettered access to the DVDs that the trial court had granted them.

. Jefferson’s second trial—and the ruling that is pertinent to this appeal—occurred in March 2011, at which time this court’s DeBella opinion had been on the books for almost a year. The trial court's own statements in the second trial demonstrate its awareness of both the court of appeals division’s and the supreme court’s opinions in that case.