JUSTICE GABRIEL, concurring in part and dissenting in part.
¶25 I agree with the majority's conclusion that the jury instructions at issue did not shift the burden of proof to petitioner Robert Ray. I cannot agree, however, with the majority's analysis of the issue relating to the jury's access to the video of the interview of witness Jeremy Green. Unlike the majority, I believe that this court's decisions in DeBella v. People , 233 P.3d 664 (Colo. 2010), and People v. Jefferson , 2017 CO 35, 393 P.3d 493, are dispositive and require reversal on this issue. Accordingly, I respectfully concur in Part II but dissent from Part III of the majority opinion.
I. Factual Background
¶26 After the incident that led to the charges in this case, the police interviewed *420 Green about the events at issue. In this interview, Green repeatedly stated that Ray had shouted to the entire crowd, "I'll kill all you! I'll kill everybody!" Green stated that Ray yelled this at least six times.
¶27 When the prosecution called Green as a witness at Ray's trial, however, he testified that he had little memory of any part of the incident. Indeed, during his testimony, he stated, in words or substance, "I don't remember," well over one hundred times.
¶28 In light of this lack of memory, the prosecution proffered, and the trial court admitted into evidence, the video of Green's interview. This evidence was important because it was the only direct evidence establishing Ray's intent to kill, which was an essential element of numerous of the crimes for which the jury ultimately convicted Ray. Indeed, in its closing argument, the prosecution relied heavily on the video, which the prosecution several times noted the jury would get to see, to establish Ray's intent. By way of example, the prosecution repeatedly reminded the jury of Ray's threat to kill everyone and stated, "It was not an idle threat." The prosecution further observed that sometimes a defendant announces his intention very clearly, and it argued, based on the Green interview, "Mr. Ray intended to kill. His announcement of that fact over and over and over again was not playing around, was not a joke. It was not an idle boast." The prosecution then asked rhetorically, "Is his conscious objective[,] his goal and his desire to kill another person that night? I'll kill all you, I'll kill everybody."
¶29 At the time the court admitted the video of Green's interview, it advised the parties that it would allow further argument as to whether the video should be submitted to the jury during its deliberations. The court subsequently entertained argument, and Ray's counsel contended that if the court was going to provide the video to the jurors, then "there should be some restrictions because ... the case law is pretty clear when the jury wants to see a video ..., that's supposed to be done in the presence of the parties so they cannot keep playing it back and forth, back and forth." Counsel further asserted that the video should only be played if the jurors asked to see it because to allow the jurors to watch the video without restriction would highlight Green's testimony above that of the other witnesses.
¶30 The prosecution responded that defense counsel was incorrect about the law. In the prosecution's view, "any exhibit that was admitted goes back to the jury for their unfettered access, whether it's a statement of the defendant, whether it's a crime scene photograph, whether it's a witness statement."
¶31 The court agreed with the prosecution, citing People v. Pahlavan , 83 P.3d 1138 (Colo. App. 2003), and People v. Isom , 140 P.3d 100 (Colo. App. 2005). The court then ordered that the prosecution make available a DVD of the interview and any associated equipment to allow the jury to watch the video. The court further asked that the prosecution provide "training" to its staff regarding the operation of the equipment and stated that the bailiff would be permitted to go into the jury room to show the jury how to operate the equipment, with the restriction that the jurors not discuss the case while the bailiff was in the room. Finally, the court explained that its procedure was to leave the equipment in a particular hallway until the jurors wanted to watch the video, at which point they would simply need to contact the bailiff. The court provided no limitation on when or how often the jurors could watch the video, nor did it instruct the jury not to afford undue weight or emphasis to the video.
¶32 Notably, no party appears to dispute that a request to the bailiff for the equipment would not have been on the record.
II. Analysis
¶33 I begin by addressing the People's argument that Ray did not preserve the argument that he is now making regarding the video of the Green interview, and I note our standard of review. I then address the applicable law and apply that law to the facts of this case.
*421 A. Preservation and Standard of Review
¶34 The People contend that Ray did not preserve the argument regarding the video of the Green interview that he is now making before us. In the division below, however, the People conceded that Ray preserved this argument, and the division so concluded. I believe that the record fully supports the People's prior concession and the division's conclusion. As noted above, the record shows that Ray made precisely the same argument that he is making here. Accordingly, in my view, he preserved this issue for our review.
¶35 Control over the use of exhibits during jury deliberations rests firmly within the trial court's discretion, and we may not substitute our own judgment for that of the trial court. Jefferson , ¶ 25, 393 P.3d at 498. Accordingly, we will not disturb the court's refusal to limit the use of an exhibit unless the court's decision was manifestly arbitrary, unreasonable, or unfair. Id. at ¶ 25, 393 P.3d at 498-99. In affording discretion to a trial court, however, an appellate court may not abdicate its responsibility to review the trial court's determinations. Id. at ¶ 25, 393 P.3d at 499. A trial court abuses its discretion when it misapplies the law. Id.
¶36 Not every abuse of discretion, however, impairs the reliability of a conviction to a degree that requires reversal. Id. at ¶ 26, 393 P.3d at 499. Pursuant to Crim. P. 52(a), "[a]ny error, defect, irregularity, or variance which does not affect substantial rights" is deemed harmless and "shall be disregarded." Thus, when a defendant objects to and preserves a non-constitutional trial error, the reviewing court will overturn his or her conviction only "if the error 'substantially influenced the verdict or affected the fairness of the trial proceedings.' " Hagos v. People , 2012 CO 63, ¶ 12, 288 P.3d 116, 119 (quoting Tevlin v. People, 715 P.2d 338, 342 (Colo. 1986) ).
B. Applicable Law
¶37 "In this jurisdiction we have long adhered to the rule that absent a specific exclusion of some particular class of exhibits, trial courts exercise discretionary control over jury access to trial exhibits during their deliberations." Frasco v. People , 165 P.3d 701, 704 (Colo. 2007).
¶38 In DeBella , 233 P.3d at 665-69, and Jefferson , ¶¶ 25-62, 393 P.3d at 498-504, we considered trial courts' exercise of such discretionary control in cases involving jury access to videotaped statements of child sexual assault victims. Because I believe that these cases should control our decision here, I discuss them in some detail.
¶39 In DeBella , 233 P.3d at 665, the People charged the defendant with sexual assault on a child and enticement. The evidence at trial included two videotaped interviews in which the victim had described the incidents underlying the charges to a detective and to a counselor. Id. Parts of the first videotape and all of the second were ultimately admitted into evidence and played for the jury in open court. Id. At the close of the evidence, the court announced its intent to provide the jury with a television and the second videotape, thus allowing the jury unconstrained access to the second videotape during deliberations. Id. at 665-66. The court decided not to provide the first videotape because it had not been redacted and thus contained portions of the interview that the court had ruled inadmissible. Id. at 666.
¶40 Defense counsel objected to the court's plan, contending that unless the court imposed restrictions on the jury's access to the second videotape, the jury's ability to review the videotape might result in undue prejudice to the defendant. Id. The court overruled this objection, relying on People v. McKinney , 80 P.3d 823, 829 (Colo. App. 2003), rev'd , 99 P.3d 1038 (Colo. 2004), in which the division had stated that pursuant to the amended C.R.C.P. 47(m), a basis no longer existed for prohibiting juror access during deliberations unless such access would be "infeasible." DeBella , 233 P.3d at 666 (quoting McKinney , 80 P.3d at 829 ).
¶41 The jury eventually found the defendant guilty as charged, and he appealed, arguing, as pertinent here, that the trial court had committed reversible error when it allowed the jury unfettered access to the videotape during deliberations. See People v. DeBella , 219 P.3d 390, 392 (Colo. App. 2009), rev'd , 233 P.3d 664 (Colo. 2010). Before the *422 defendant's conviction was final, however, this court issued its decision in Frasco , 165 P.3d at 704, disapproving of the application of C.R.C.P. 47(m) to exhibits in criminal proceedings and clarifying that "control over the use of exhibits during jury deliberations in criminal proceedings must remain firmly within the discretion of the [trial] court." The DeBella division acknowledged that Frasco controlled but nonetheless affirmed. DeBella , 219 P.3d at 393-97.
¶42 We granted certiorari and reversed. See DeBella , 233 P.3d at 665. We began by noting that Frasco had not announced a new rule of law but rather had reaffirmed this court's decision in Settle v. People , 180 Colo. 262, 504 P.2d 680, 680-81 (1972), in which we had established that trial courts retain discretionary control over jury access to trial exhibits. See DeBella , 233 P.3d at 666. We thus viewed the question before us as whether the trial court had abused its discretion in providing the jury with unfettered access to the videotape during deliberations. See id. at 665.
¶43 In addressing this question, we observed that because the trial court felt bound by McKinney , "it thought its hands [were] tied with regard to the jury's access to the tape." Id. at 668. As a result, we concluded that the trial court had made no determination as to whether unfettered access to the videotape at issue would prejudice the defendant and, thus, the court had abused its discretion. Id. at 667-68.
¶44 Turning to the appropriate remedy, we determined that the trial court's abuse of discretion was not harmless and warranted reversal of the defendant's conviction. See id. at 668. We based this conclusion on the facts that (1) the trial court's failure to exercise control over the jury's access to the videotape or to specify why such control was unnecessary left us with no record as to how-or even if-the jury reviewed the tape during deliberations; (2) the "nearly silent record" prevented us from determining whether the trial court had fulfilled its obligation to "observe caution" that the videotape was not used in such a manner as to create a likelihood of the jury's giving it undue weight or emphasis; (3) "the videotape was the linchpin of the prosecution's case" because it was the only complete recounting of the charged assaults; and (4) because the victim's testimony deviated from his videotaped statement, the inconsistencies "underscore[d] how central the victim's credibility was to the resolution of the trial, thus heightening the danger of providing the jury with unchaperoned access to only one side of the story." Id. at 668-69.
¶45 In reaching this conclusion, we rejected the People's assertion that it was speculative to presume that the jury watched the video at all, much less whether the jury gave it undue weight or emphasis. Id. at 668. We stated, "Where holes in the record are the result of the trial court's error and pertinent inquiries on appeal are reduced to exercises in speculation, the lack of record support should not weigh against the defendant's interests." Id.
¶46 We reached a similar conclusion in Jefferson , ¶¶ 39-62, 393 P.3d at 500-04. There, we acknowledged that the trial court understood its duty to exercise discretion in determining whether to allow the jury unfettered access to a DVD of the child victim's forensic interview. Id. at ¶ 41, 393 P.3d at 501. The factors that the court had considered in making this determination, however, did not support a conclusion that the court had fulfilled its duty to guard against unfair or prejudicial use of the video at issue. Id. This was because all three factors on which the court relied were "virtually ubiquitous" in cases like the one there before us. Id. at ¶ 48, 393 P.3d at 502. We thus concluded that a court that measured the potential for undue emphasis by relying on those factors was likely to find all three factors present, regardless of the risk actually presented by giving the jury unfettered access to the DVD at issue. Id. at ¶ 49, 393 P.3d at 502. Accordingly, we determined that the trial court had abused its discretion in granting the jury unfettered access to the DVD. Id. at ¶ 53, 393 P.3d at 503.
¶47 The question then became whether the error was harmless. For several reasons, we could not say that it was. Id. at ¶ 62, 393 P.3d at 504.
*423 ¶48 First, we observed that "[t]he nature of the DVD and the significant role that it played in [the defendant's] trial only exacerbate[d] our concerns regarding the verdict and the fairness of the proceedings." Id. at ¶ 59, 393 P.3d at 503. In support of this conclusion, we noted that (1) the prosecution had presented no physical evidence of the crime; (2) the case thus turned on the victim's allegations, which were at times inconsistent; and (3) because the video contained details that the victim could not remember when she testified at trial, the video likely served as the linchpin of the prosecution's case. Id. at ¶ 59, 393 P.3d at 503-04.
¶49 Second, we stated, "With unfettered access to the DVD during its deliberations, the jury was able to watch and re-watch [the victim] describe the abuse in a manner functionally equivalent to her live testimony, except with more-and more vivid-detail." Id. at ¶ 60, 393 P.3d at 504.
¶50 Finally, we noted that the prosecutor had told the jurors to review the DVD and to decide for themselves. Id. As a result, we believed that the jury was more likely to have placed undue emphasis on the DVD, particularly given the inconsistencies between the victim's recorded statement and her trial testimony and the dearth of physical evidence in the case. Id. We thus concluded that the jury's unfettered access to the DVD substantially influenced the verdict and fairness of the proceedings. See id.
¶51 In reaching this conclusion, we were not persuaded by the People's argument that the brevity of the jury's deliberations rendered any error harmless. Id. at ¶ 61, 393 P.3d at 504. We noted that the length of the jury's deliberations would have allowed the jurors to watch the DVD repeatedly had they wished to do so. Id. Moreover, we reiterated our statement in DeBella that when holes in the record (e.g., the absence of evidence regarding whether the jury actually watched the DVD) resulted from the trial court's error and pertinent inquiries on appeal were reduced to speculation, the lack of a record should not weigh against the defendant. Id.
C. Application
¶52 In my view, DeBella and Jefferson are dispositive in the present case.
¶53 As in DeBella , the trial court relied on now-discredited principles of law in allowing the jury to have unfettered access to the video at issue. In DeBella , 233 P.3d at 666, the trial court had relied on the court of appeals division's opinion in McKinney , which was subsequently disapproved in Frasco , 165 P.3d at 703. In the present case, the trial court similarly relied on Pahlavan , 83 P.3d at 1141, and Isom , 140 P.3d at 104, both of which had followed McKinney . Accordingly, for the reasons set forth in DeBella , 233 P.3d at 667-68, I believe that the trial court abused its discretion in affording the jury unfettered access to the videotape of the Green interview.
¶54 The question thus becomes whether this error was harmless. Unlike the majority, I cannot say that it was.
¶55 As an initial matter, I note that I am unpersuaded by the People's argument that it is unclear whether the jurors even watched the video. In my view, the record reveals that the trial court intended for the jury to have unrestricted access to the video. The prosecution argued for such unfettered access, and the court agreed with the prosecution's argument. Moreover, the court ordered the prosecution to make the video and associated equipment available for the jurors, and the court placed no restrictions on the jurors' viewing of that video. They needed only to contact the bailiff when they wanted to watch it, and the parties appear to agree that such requests would not have been on the record. And given the prosecution's repeated reminders to the jurors that they would have the opportunity to watch the video, I am unwilling to presume that they did not do so.
¶56 Even if there were a question as to whether the jurors had watched the video, however, as we stated in DeBella and reiterated in Jefferson , "[w]here holes in the record [e.g., the absence of evidence regarding whether the jury actually watched a video] are the result of the trial court's error and pertinent inquiries on appeal are reduced to exercises in speculation, the lack of record *424 support should not weigh against the defendant's interests." DeBella , 233 P.3d at 668 ; accord Jefferson , ¶ 61, 393 P.3d at 504.
¶57 In addition to the foregoing, as was the case with the recorded interviews in DeBella and Jefferson , the video of Green's interview was important to the prosecution's case. As noted above, it appears to have been the principal evidence of Ray's intent to kill, which was an element of many of the offenses with which he was charged and of which he was convicted. Indeed, apparently acknowledging this fact, the prosecution relied heavily (and repeatedly) in closing arguments on the Green video to argue that Ray had the requisite intent.
¶58 Finally, at trial, Green had virtually no memory of the facts that he recounted in the interview, which was close in time to the incident at issue. As a result, the jury would have had to rely substantially on the Green interview to decide whether Ray had formed the requisite intent, and they were able to watch and re-watch Green describe the events at issue as if he were a witness inside the jury room, but without that testimony's being subject to cross-examination and without affording equal access to Ray's side of the story. See DeBella , 233 P.3d at 669 (noting that the inconsistencies between the victim's recorded statement and her trial testimony underscored how central the victim's credibility was in the case, "thus heightening the danger of providing the jury with unchaperoned access to only one side of the story").
¶59 For the reasons set forth in Jefferson , ¶ 60, 393 P.3d at 504, the jury's ability to review the video in this way presented a substantial risk that the jury would give the video undue weight, and this risk was exacerbated by the lack of any cautionary instruction from the court and by the prosecution's reminders in closing arguments that the jury would have the opportunity to watch the video in the jury room. See also id. (noting that the prosecutor's request in rebuttal closing argument that the jurors watch the DVD there at issue likely resulted in the jury's placing undue emphasis on the DVD and that, given the inconsistencies between the witness's recorded statement and her trial testimony, the likelihood of such undue emphasis substantially influenced the verdict and the fairness of the proceedings).
¶60 For these reasons, I believe that the trial court's error in allowing the jurors unfettered access to the video of the Green interview was not harmless.
III. Conclusion
¶61 In light of the foregoing, I would conclude that the trial court abused its discretion in affording the jury unfettered access to the videotape of the Green interview. Moreover, unlike the majority, I cannot say that this error was harmless. Accordingly, I would reverse the division's judgment on this point.
¶62 For these reasons, I respectfully concur in part and dissent in part from the majority opinion in this case.
I am authorized to state that JUSTICE HART joins in this concurrence in part and dissent in part.