Opinions of the Colorado Supreme Court are available to the public and can be accessed through the Judicial Branch's homepage at http://www.courts.state.co.us. Opinions are also posted on the Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
April 8, 2019

## 2019 CO 21

**No. 15SC268, *Ray v. People*—Jury Instructions—Self-Defense—Burden of Proof—Testimonial Evidence—Jury Deliberations—Abuse of Discretion—Harmless Error.**

Ray petitioned for review of the court of appeals' judgment affirming his convictions for attempted first degree murder, first degree assault, and accessory to first degree murder. The supreme court holds that because the language of a self-defense-related instruction did not permit the jury to reconsider the court's determination, based on the evidence at trial, that the affirmative defense of person was available to Ray, and because the jury was properly instructed concerning the People's burden to disprove that, and any, affirmative defense, the district court did not err in instructing the jury as to his assertion that he acted in defense of himself and a third person. The supreme court also holds that although error resulted from the district court's reliance on later-overruled case law permitting the jury to have unrestricted access to a witness recorded interview admitted as an exhibit at trial, when the content of that exhibit is compared with the other evidence admitted at trial, the error was harmless. The judgment of the court of appeals is therefore affirmed.

## The Supreme Court of the State of Colorado
2 East 14th Avenue • Denver, Colorado 80203

---

### 2019 CO 21

---

**Supreme Court Case No. 15SC268**
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 07CA561

---

### Petitioner:

Robert Keith Ray,

v.

### Respondent:

The People of the State of Colorado.

---

### Judgment Affirmed
*en banc*
April 8, 2019

---

**Attorneys for Petitioner:**
Elisabeth Hunt White
    *Boulder, Colorado*

Johnson & Klein, PLLC
Gail K. Johnson
Eric K. Klein
    *Boulder, Colorado*

The Noble Law Firm, LLC
Antony M. Noble
    *Lakewood, Colorado*

**Attorneys for Respondent:**
Philip J. Weiser, Attorney General
John T. Lee, Senior Assistant Attorney General
    *Denver, Colorado*

**CHIEF JUSTICE COATS** delivered the Opinion of the Court.
**JUSTICE GABRIEL** concurs in part and dissents in part, and **JUSTICE HART** joins in the concurrence in part and dissent in part.
**JUSTICE SAMOUR** does not participate.

¶1 Ray petitioned for review of the court of appeals' judgment affirming his convictions for attempted first degree murder, first degree assault, and accessory to first degree murder. As pertinent to the issues before the supreme court, the intermediate appellate court rejected Ray's claim that one of the self-defense-related instructions given by the district court implicitly shifted the burden of proof to him by improperly imposing conditions on the availability of that affirmative defense; and in the absence of any record indication that the jury later watched a recorded witness interview admitted as an exhibit at trial, the appellate court declined to address his claim that the district court abused its discretion in allowing the jury unrestricted access to that recording.

¶2 Because the language of the instruction in question did not permit the jury to reconsider the court's determination, based on the evidence at trial, that the affirmative defense of person was available to Ray, and because the jury was properly instructed concerning the People's burden to disprove that, and any, affirmative defense, the district court did not err in instructing the jury as to his assertion that he acted in defense of himself and a third person. Although error resulted from the district court's reliance on later-overruled case law permitting the jury to have unrestricted access to the exhibit in question, when the content of that exhibit is compared with the other evidence admitted at trial, the error was harmless. The judgment of the court of appeals is therefore affirmed.

## I.

¶3 Robert Ray was charged with first degree murder and accessory to murder in connection with the shooting death of Gregory Vann, as well as attempted murder for

trying to shoot Jeremy Green, and both first degree attempted murder and first degree assault for each of the separate shootings of Elvin Bell and Javad Marshall-Fields. He was acquitted of the murder of Vann and the attempted murder of Green but was convicted of being an accessory to the murder of Vann and of committing both attempted first degree murder and first degree assault for the shootings of Bell and Marshall-Fields. Ray was sentenced concurrently for his dual convictions of attempted murder and assault with regard to Bell and his dual convictions of attempted murder and assault with regard to Marshall-Fields, but consecutively for the crimes he committed against Bell, the crimes he committed against Marshall-Fields, and the crime he committed relative to the murder of Vann, resulting in a total sentence to the custody of the department of corrections for 108 years.[1]

¶4    The charges all arose from events occurring at a melee at Lowry Park on July 4, 2004, and its aftermath. The evidence at trial included numerous first-hand witness accounts, a home video taken by one of the attendees, a recording of a police interview of Green made shortly after the events in question, and photographic, real, and testimonial evidence concerning the wounds of Bell and Marshall-Fields and the

---

[1] In a later trial not at issue here, the defendant was convicted as a complicitor for, among other crimes, the subsequent murders of Marshall-Fields and his fiancée. The attempted first degree murder convictions in the present case were used as sentence aggravators in the defendant's death sentence that resulted from the later trial. Evidence relating to these murders was not introduced at trial in the present case.

4

weapons used by Ray and Sir Mario Owens, Ray's very close friend. The defendant also testified on his own behalf.

¶5 Although there was much conflicting testimony, it was undisputed that the Lowry Park event, attended by as many as 200 people, was organized by Vann and Marshall-Fields as a musical event and barbeque, which was free and open to the public. Early in the evening, the defendant was confronted by Marshall-Fields about his behavior at the event, as a result of which interaction the defendant's wife, who was also in attendance with his sister, called Owens to come and support the defendant. Sometime later, about 9:00 p.m., as the wife and sister were attempting to drive away, they became embroiled in a confrontation with a crowd of people, which was joined by the defendant and Owens. A home video showed both men and women involved in the struggle. There was testimony that Vann was attempting to break up the fight, and Green expressly stated in the interview that he confronted the defendant about his aggressive behavior, head-butted him in the face, and heard him, at several points during the confrontation, threaten to kill everybody.

¶6 Shortly thereafter, the defendant admittedly lifted his shirt as he walked forward toward the crowd, revealing a handgun in his waistband, and the defendant's wife identified another man seen in the home video, similarly raising his shirt, as Owens. In the confrontation that ensued, Owens shot Vann in the chest at close range and once more after he fell. As Owens attempted to escape to the car being driven by the defendant, he was pursued by Bell and Marshall-Fields, both of whom were then shot several times. Although both men indicated that they initially thought they had been shot by Owens,

5

being the only person they had seen with a gun, another witness testified that he saw the defendant calmly come around the car, put his gun under his left arm, and shoot both men repeatedly.

¶7     One nine-millimeter and two .380 caliber shell casings were found at the scene, and two .380 caliber bullets were recovered from the body of Vann, who was clearly shot by Owens. One bullet fragment that was later removed from the chest wall of Bell, whom the defendant admitted he shot, was identified as having splintered from a nine-millimeter bullet. Both of Marshall-Fields's wounds had clear entrance and exit wounds, leaving no identifiable bullets or bullet fragments. The defendant's wife testified that the defendant's stepfather disposed of both guns. No witness testified to seeing anyone other than Owens or the defendant with a weapon.

¶8     Although the defendant admitted that in the days following the shooting, he took active steps to help Owens evade capture, he also testified that he did not shoot Marshall-Fields and that although he did shoot Bell, he did so only in defense of himself and Owens. The defendant confirmed that he had a nine-millimeter semiautomatic handgun in his waistband, but he testified that he showed it only in an attempt to force the crowd back so that he could search for a chain he lost during the struggle. He also testified that he never saw Owens with a gun that night, but that he did see blood on Owens's shirt when he was being beaten by Bell and therefore believed Bell had shot Owens, causing the defendant to defensively shoot Bell. Finally, with regard to Green's statement that the defendant repeatedly threatened to kill everybody, the defendant testified simply that he did not recall doing so.

6

¶9    Following affirmance of his convictions by the court of appeals, the defendant petitioned this court for further review on a host of issues. We issued our writ of certiorari only with regard to the questions whether the district court's instructions erroneously shifted the burden of proof relative to the defendant's assertion of self-defense and whether the jury's having had unfettered access to the Green videotaped interview violated the defendant's federal and state constitutional rights to due process and a fair trial.

**II.**

¶10    The jury was instructed on the defendant's asserted affirmative defense of acting in defense of himself or a third person in four separate instructions. In addition to an instruction generally notifying the jury of and explaining the prosecution's burden of proof with regard to the elements of each offense, which included committing the other elements without the affirmative defense, the district court instructed the jury, in a separate instruction, that the evidence had raised an affirmative defense; that the prosecution had the burden to prove the defendant's guilt beyond a reasonable doubt as to that affirmative defense as well as the other elements of the crime charged; and that if after considering the evidence of the affirmative defense with the other evidence in the case the jury was not convinced beyond a reasonable doubt as to the defendant's guilt, it would be required to return a not guilty verdict. In a third instruction, the jury was then instructed as to the circumstances under which the defendant's use of physical force and deadly physical force would be justified in defense of himself or another person, including the requirement that the defendant must have had a reasonable belief that he

7

or another person was in imminent danger of being killed or of receiving great bodily injury.

¶11 In the instruction challenged by the defendant here, numbered 25, the jury was further instructed concerning the question whether an actual belief by the defendant, if the jury were to find him to have had one, could be considered to have been supported by reasonable grounds.[2] Specifically, the defendant contends that by instructing the jury in the language, "[i]n deciding whether or not the defendant had reasonable grounds for believing," and further that the jury "should determine whether or not he acted as a reasonable and prudent person," the court implicitly imposed conditions on even the "availability" of the defense, effectively shifting the burden to him to first prove these conditions before being entitled to have the prosecution disprove the defense beyond a reasonable doubt. Unlike our precedent upon which the defendant relies, Instruction No. 25 does not mention anything about the "availability" of the defense, much less suggest

---

[2] In deciding whether or not the defendant had reasonable grounds for believing that he or another was in imminent danger of being killed or of receiving serious bodily injury, or that he or another was in imminent danger from the use of unlawful physical force, you should determine whether or not he acted as a reasonable and prudent person would have acted under like circumstances. In determining this, you should consider the totality of the circumstances, including the number of people reasonably appearing to be a threat.

It is not enough that the defendant believed himself or another to be in danger, unless the facts and circumstances shown by the evidence and known by him at the time, or by him then believed to be true, are such that you can say that as a reasonable person he had grounds for that belief.

8

that the defendant bore a burden to prove preconditions to its availability; rather, on its face, the instruction purports to further explain the meaning of a statutory concept included in the defense itself.

¶12   It is now well-settled that the issue of justification for intentionally or knowingly killing another person in defense of oneself or a third person is an affirmative defense, as to which the trial court is obliged to instruct the jury whenever the court determines that the defendant has presented some credible evidence on the issue and the defendant requests that the court do so. § 18-1-407(1), C.R.S. (2018); § 18-1-704(1), (2)(a), C.R.S. (2018); § 18-1-710, C.R.S. (2018); *Montoya v. People*, 2017 CO 40, ¶¶ 26–29, 394 P.3d 676, 686–88 (explaining *People v. Pickering*, 276 P.3d 553, 555 (Colo. 2011) (stating that self-defense is an affirmative defense with respect to crimes requiring intent, knowledge, or willfulness)); *People v. Speer*, 255 P.3d 1115, 1119 (Colo. 2011). Once the defense has been adequately raised and presented by the court to the jury, the guilt of the defendant must be established by the prosecution beyond a reasonable doubt as to that affirmative defense, just as to the other elements of the offense against which the defendant is defending. § 18-1-407(2); *Pickering*, 276 P.3d at 555.

¶13   On several occasions in the past, we have drawn a clear distinction between the prosecution's burden to disprove an affirmative defense to the jury's satisfaction, beyond a reasonable doubt, once it has been placed at issue, and the question whether the defense has been placed at issue in the first place, finding in those cases that an instruction permitting the jury to redetermine the question of a defense's availability or applicability effectively permitted the jury to absolve the prosecution of its burden to disprove the

9

defense and therefore its duty to prove all of the elements of the offense. *See People v. Janes*, 982 P.2d 300, 303–04 (Colo. 1999); *Lybarger v. People*, 807 P.2d 570, 574, 579, 581–83 (Colo. 1991). In *Lybarger*, where the jury was instructed both that it should find the defendant guilty if the affirmative defense in question was not "available" to him and that the defense would not be "available" to him if the People proved specified conditions virtually identical with the elements of the crime with which he was charged, we found that taken together these instructions not only erroneously relegated to the jury the function of determining the availability or non-availability of the affirmative defense but also effectively eliminated the prosecution's burden of proof with respect to that defense. 807 P.2d at 574, 581–82. Again, in *Janes*, which involved the virtually unique situation of the so-called "make-my-day" defense, which can operate as either a pre-trial immunity, which must be proved by the defendant, or an affirmative defense at trial, to be disproved by the prosecution, we held that instructing the jury in the language of the immunity— that the affirmative defense would not be "available" unless the jury first found the victim to have made a knowing unlawful entry—similarly relieved the prosecution of any burden to disprove the defense, until after proof of a precondition only the defendant could have an interest in proving. 982 P.2d at 303–04.

¶14 Unlike the erroneous instructions in *Lybarger* and *Janes*, Instruction No. 25 neither stated, nor even implied, anything about the availability or applicability of the defense. Rather, it expressly referenced, and embellished on a concept contained in, the immediately preceding affirmative defense instruction, which itself expressly spelled out the prosecution's burden to disprove the defense beyond a reasonable doubt, by detailing

10

the findings necessarily included in the conditions of the defense. To the extent the defendant suggests that the instruction's use of the phrase "whether or not" relieved the prosecution of its burden by implying an obligation of the jury to determine whether any belief actually held by the defendant was or was not reasonable prior to holding the prosecution to its burden to disprove that the defendant's conduct was justified, there was little chance the jury could have been misled by such a subtle and nuanced interpretation, especially in light of its other express instructions concerning the prosecution's burden. The jury was expressly instructed of the prosecution's burden to disprove the affirmative defense multiple times, in substantially the language of the statutes and pattern instructions, including in the very affirmative defense instruction whose terms were the subject of explanation in Instruction No. 25.

## III.

¶15   Despite being refreshed with the transcript of the recording of his interview with the police, Green repeatedly asserted a lack of memory and therefore failed to answer a majority of the prosecutor's questions concerning the Lowry Park shootings. As a result, the videotaped interview was admitted into evidence as a prior inconsistent statement. Over the defendant's objection, the district court ruled that recent changes to the civil procedural rules had eliminated any limitation on exhibits being taken into the jury room during deliberations, and it ordered that the video and equipment to view it be made available to the jury. Although the cases of *Frasco v. People*, 165 P.3d 701 (Colo. 2007), and *DeBella v. People*, 233 P.3d 664 (Colo. 2010), had not yet been announced by this court, and the district court could therefore not have been aware of them, our rulings in those cases

11

expressly overruled the precedents relied on by the district court and made clear that its ruling permitting unfettered access to Green's out-of-court interview, without any exercise of discretion on its part, was error.[3]

¶16     However, even a properly objected-to trial error will be disregarded as harmless if that error did not substantially influence the verdict or affect the fairness of the trial proceedings. *James v. People*, 2018 CO 72, ¶ 19, 426 P.3d 336, 341; *see also* Crim. P. 52(a). While the strength of the evidence supporting a verdict is often an important consideration in assessing harmlessness, so too is the specific nature of the error in question and the nature of the prejudice or risk of prejudice associated with that error. *People v. Roman*, 2017 CO 70, ¶ 14, 398 P.3d 134, 138; *Crider v. People*, 186 P.3d 39, 43 (Colo. 2008).  As we made clear in *Frasco*, the reason trial courts have an obligation, at least where prompted to do so by a party, to exercise discretion in permitting testimonial exhibits to be viewed by deliberating juries is to guard against their being given undue weight or emphasis, much as they have an obligation with regard to jury requests to review transcripts of specific trial testimony.  165 P.3d at 703–05 (analogizing testimonial exhibits to the trial transcripts at issue in *Settle v. People*, 504 P.2d 680 (Colo. 1972)); *see also Martinez v. People*, 2017 CO 36, ¶ 31, 393 P.3d 557, 563 ("[J]urors' unlimited access in the

---

[3] To be clear, the error occurred when the court ruled, without considering the risk of undue prejudice, and consequently without exercising any discretion, that the jury must be allowed unfettered access to the exhibit.  *See DeBella v. People*, 233 P.3d 664, 668 (Colo. 2010).  Therefore, the question whether, or how many times, the jury watched the recorded interview could at most be relevant to the harmfulness of that erroneous ruling.

jury room to only one side of the story heightened the risk that they would give that side undue weight . . . .").  While we have never circumscribed the trial court's discretion in this regard by mandating time limitations on jury access or requiring particular limiting instructions, *see Frasco*, 165 P.3d at 704, we have consistently emphasized that the trial court must exercise its discretion in allowing such exhibits into the jury room, with the ultimate objective of assessing whether using the exhibit in question will aid the jury in its proper consideration of the case, and even if so, whether a party will nevertheless be unfairly prejudiced by the jury's use of it, *id.* at 704–05; *see also DeBella*, 233 P.3d at 668.

¶17    Because testimonial exhibits will, by definition, always have been admitted into evidence, unless they were erroneously admitted in the first place, allowing them into the jury room during deliberations will never risk exposure of the jury to evidence not properly before it.  Nevertheless, the discretionary decision whether to permit the jury to view testimonial exhibits again, and perhaps repeatedly, is not dissimilar from a trial court's discretionary determination with respect to the admissibility of cumulative testimony in the first instance: whether the incremental probative value of that cumulative testimony is substantially outweighed by the unfairly prejudicial impact of its repetition.  *See People v. Saiz*, 32 P.3d 441, 446, 448 (Colo. 2001) (explaining that CRE 403 requires trial courts to balance the incremental probative value of evidence relative to other evidence in the case against the rule's policy reasons for exclusion of, among other things, cumulative evidence).  In each case, the question for the court is whether the added jury exposure, in light of all the other evidence before it, will be more helpful or more harmful to its deliberations, *see Frasco*, 165 P.3d at 704–05; *Saiz*, 32 P.3d at 446, and

13

because this discretionary choice involves a balance of helpfulness and harmfulness in the first instance, the question whether that balance was made erroneously or amounted to an abuse of discretion will necessarily be closely related to the question whether any error in admission, if it occurred, was harmless. With regard to the question of admissibility in the first instance, we have long recognized that the decision is a highly discretionary one, subject to review on appeal only on the assumption of maximum probative value and minimum unfair prejudice. *People v. Gibbens*, 905 P.2d 604, 607 (Colo. 1995).

¶18 Accordingly, we have found the failure of trial courts to adequately control jury access to testimonial exhibits to be most problematic where the jury's ultimate determination would necessarily turn on its assessment of the credibility of witnesses, as distinguished from the force of real, or demonstrative, evidence. This has especially been the case where resolution of the issue in question must turn on the assessment of a witness account of the commission of the crime, by the only person other than the defendant to have purportedly witnessed the crime denied by him, which account is both contradictory of the principal defense and the only testimonial account the jury is permitted to repeatedly view. *People v. Jefferson*, 2017 CO 35, ¶ 59, 393 P.3d 493, 503–04; *DeBella*, 233 P.3d at 668–69. In *DeBella*, where the credibility of the child sexual-assault victim was severely challenged on cross-examination and the child's lack of credibility was the principal theory of the defense, we therefore found reversible the decision to allow unlimited jury access to his hour-long, out-of-court interview, which—being the only complete recounting of the assaults—we characterized as the "linchpin" of the

14

prosecution's case. 233 P.3d at 668–69. Similarly, in *Jefferson*, where the principal theory of the defense was that the child sexual assault allegations were not credible, and having introduced no physical evidence of the crime, the prosecution's case once again rested on the alleged victim's often inconsistent allegations, we found reversible the trial court's decision to allow unlimited jury access to a DVD of the child sexual-assault victim's out-of-court interview. ¶¶ 59–60, 393 P.3d at 503–04; *cf. Martinez*, ¶¶ 30–33, 393 P.3d at 562–63 (distinguishing *DeBella* and *Jefferson* largely on grounds that DVDs of the victim interviews in *Martinez* did not similarly serve as linchpin of prosecution's case, where defendant did not base his defense on inconsistencies between victims' in- and out-of-court accounts and where victims' in-court testimony was sufficiently detailed that exhibits were not needed to fill gaps in that testimony).

¶19     Unlike the testimonial exhibits at issue in *DeBella* and *Jefferson*, the videotape of Green's interview made shortly after the shootings in this case was not inconsistent with anything to which he testified at trial and did not directly contradict any testimony of the defendant concerning the pertinent events. The exhibit was admitted on the basis of Green's failure to recall, a ruling not before this court, rather than any contradiction of his testimony at trial. And when confronted with Green's statement in the exhibit to the effect that he threatened to kill everyone, the defendant did not dispute making those statements but testified merely that he did not recall doing so.

¶20     Perhaps even more importantly, however, unlike in *DeBella* and *Jefferson*, the defendant's guilt in this case did not turn on the credibility of conflicting testimony of the principals, unsupported by corroborating physical evidence or the testimony of other

15

disinterested witnesses. With regard to Bell, there was never any dispute that the defendant intentionally shot him at close range with a nine-millimeter semiautomatic handgun. The defendant merely disputed the number of shots fired and asserted that he shot Bell in defense of himself and Owens, a matter as to which Green's out-of-court statement that the defendant earlier in the evening threatened to kill everyone could have had but peripheral relevance. With regard to that defense, the earlier, universal threat against everyone present at the event could at most suggest that the defendant had already formed an intent to kill Bell, without regard to any imminent threat from him. In stark contrast to this generalized threat, allegedly made in anger and in the midst of a confrontation against a number of people, however, the direct and primary evidence of the defendant's intent to kill came from the shooting itself and its surrounding circumstances, including the defendant's preparatory threatening gesture to the crowd, the fact of his shooting Bell multiple times at close range, the relatively weak evidence that he had reasonable grounds to believe he or Owens was being threatened with deadly force, and, most particularly, eye-witness testimony that he concealed his gun under his arm and calmly shot both Bell and Marshall-Fields during their struggle with Owens. *See People v. Dist. Court*, 779 P.2d 385, 388 (Colo. 1989) (stating that evidence of intent may include "the use of a deadly weapon, the manner in which it was used, and the existence of hostility . . . between the accused and the victim" and noting that "[t]he fact finder may infer an intent to cause the natural and probable consequences of unlawful voluntary acts"); *see also People v. Opana*, 2017 CO 56, ¶ 17, 395 P.3d 757, 762 (stating that the intended, natural, and probable consequence of the defendant admittedly shooting the

16

victim at close range was death). In consideration of this other and much more direct and powerful evidence that the defendant was not acting in self-defense, there is little likelihood that having the opportunity to see Green's pre-recorded statement more than once had a substantial impact on the jury's verdict as to Bell. *See James*, ¶ 19, 426 P.3d at 341.

¶21 With respect to the shooting of Marshall-Fields, in the absence of conclusive evidence that his wounds were inflicted with the defendant's gun, the defendant denied any responsibility for that shooting. Nevertheless, the relevance of Green's statements could at most have been equally peripheral. The universal threat to kill everyone at the event offered little motive or support for the shooting of Marshall-Fields, especially in light of the much more direct and powerful evidence that the defendant actually did so. Both Bell and Marshall-Fields were embroiled in a struggle with the defendant's friend Owens, and both were shot virtually simultaneously, with an eye-witness testifying that he personally watched the defendant conceal his gun beneath his arm and calmly shoot both men, one of whom the defendant admitted intentionally shooting in defense of his friend.

¶22 Unlike those instances in which we have found reversible error in allowing unrestricted access to testimonial exhibits, the exhibit in this case was therefore not only *not* the "linchpin" of the prosecution's case; rather, with regard to the shootings of Bell and Marshall-Fields, the crimes of which the defendant was actually convicted, it was neither substantially helpful nor harmful. While it may arguably have been peripherally meaningful with regard to the charge of being complicit with Owens in the murder of

17

Vann, the charge of which the defendant was acquitted, the district court did not suggest that it considered the exhibit meaningful even for that purpose. Indeed, in closing argument, the prosecution relied on Green's, "I'll kill you all," statements only as evidence of the defendant's complicity in the murder of Vann. The error in this case resulted simply from the district court's reliance on existing precedent to the effect that the exhibit was to go to the jury as a matter of course, regardless of its possible impact on the jury's deliberations.

¶23 Under these circumstances, we can say with confidence that there was not even a reasonable possibility that allowing the jury to view the exhibit during deliberations adversely affected the jury's verdict, much less that it affected a substantial right of the defendant. *See Krutsinger v. People*, 219 P.3d 1054, 1058 (Colo. 2009) (making clear that the "reasonable possibility" standard for constitutional error is a more onerous harmless-error standard than the "substantially influence" standard for non-constitutional error).

## IV.

¶24 Because the language of the instruction in question did not permit the jury to reconsider the court's determination, based on the evidence at trial, that the affirmative defense of person was available to the defendant, and because the jury was properly instructed concerning the People's burden to disprove that, and any, affirmative defense, the district court did not err in instructing the jury as to the defendant's assertion that he acted in defense of himself and a third person. Although error resulted from the district court's reliance on later-overruled case law permitting the jury to have unrestricted access

18

to the exhibit in question, when the content of that exhibit is compared with the other evidence admitted at trial, the error was harmless. The judgment of the court of appeals is therefore affirmed.

**JUSTICE GABRIEL** concurs in part and dissents in part, and **JUSTICE HART** joins in the concurrence in part and dissent in part.

JUSTICE GABRIEL, concurring in part and dissenting in part.

¶25     I agree with the majority's conclusion that the jury instructions at issue did not shift the burden of proof to petitioner Robert Ray.  I cannot agree, however, with the majority's analysis of the issue relating to the jury's access to the video of the interview of witness Jeremy Green.  Unlike the majority, I believe that this court's decisions in *DeBella v. People*, 233 P.3d 664 (Colo. 2010), and *People v. Jefferson*, 2017 CO 35, 393 P.3d 493, are dispositive and require reversal on this issue.  Accordingly, I respectfully concur in Part II but dissent from Part III of the majority opinion.

## I. Factual Background

¶26     After the incident that led to the charges in this case, the police interviewed Green about the events at issue.  In this interview, Green repeatedly stated that Ray had shouted to the entire crowd, "I'll kill all you!  I'll kill everybody!"  Green stated that Ray yelled this at least six times.

¶27     When the prosecution called Green as a witness at Ray's trial, however, he testified that he had little memory of any part of the incident.  Indeed, during his testimony, he stated, in words or substance, "I don't remember," well over one hundred times.

¶28     In light of this lack of memory, the prosecution proffered, and the trial court admitted into evidence, the video of Green's interview.  This evidence was important because it was the only direct evidence establishing Ray's intent to kill, which was an essential element of numerous of the crimes for which the jury ultimately convicted Ray.  Indeed, in its closing argument, the prosecution relied heavily on the video, which the prosecution several times noted the jury would get to see, to establish Ray's intent.  By

1

way of example, the prosecution repeatedly reminded the jury of Ray's threat to kill everyone and stated, "It was not an idle threat." The prosecution further observed that sometimes a defendant announces his intention very clearly, and it argued, based on the Green interview, "Mr. Ray intended to kill. His announcement of that fact over and over and over again was not playing around, was not a joke. It was not an idle boast." The prosecution then asked rhetorically, "Is his conscious objective[,] his goal and his desire to kill another person that night? I'll kill all you, I'll kill everybody."

¶29 At the time the court admitted the video of Green's interview, it advised the parties that it would allow further argument as to whether the video should be submitted to the jury during its deliberations. The court subsequently entertained argument, and Ray's counsel contended that if the court was going to provide the video to the jurors, then "there should be some restrictions because . . . the case law is pretty clear when the jury wants to see a video . . . , that's supposed to be done in the presence of the parties so they cannot keep playing it back and forth, back and forth." Counsel further asserted that the video should only be played if the jurors asked to see it because to allow the jurors to watch the video without restriction would highlight Green's testimony above that of the other witnesses.

¶30 The prosecution responded that defense counsel was incorrect about the law. In the prosecution's view, "any exhibit that was admitted goes back to the jury for their unfettered access, whether it's a statement of the defendant, whether it's a crime scene photograph, whether it's a witness statement."

¶31 The court agreed with the prosecution, citing *People v. Pahlavan*, 83 P.3d 1138 (Colo. App. 2003), and *People v. Isom*, 140 P.3d 100 (Colo. App. 2005). The court then ordered that the prosecution make available a DVD of the interview and any associated equipment to allow the jury to watch the video. The court further asked that the prosecution provide "training" to its staff regarding the operation of the equipment and stated that the bailiff would be permitted to go into the jury room to show the jury how to operate the equipment, with the restriction that the jurors not discuss the case while the bailiff was in the room. Finally, the court explained that its procedure was to leave the equipment in a particular hallway until the jurors wanted to watch the video, at which point they would simply need to contact the bailiff. The court provided no limitation on when or how often the jurors could watch the video, nor did it instruct the jury not to afford undue weight or emphasis to the video.

¶32 Notably, no party appears to dispute that a request to the bailiff for the equipment would not have been on the record.

## II. Analysis

¶33 I begin by addressing the People's argument that Ray did not preserve the argument that he is now making regarding the video of the Green interview, and I note our standard of review. I then address the applicable law and apply that law to the facts of this case.

## A. Preservation and Standard of Review

¶34 The People contend that Ray did not preserve the argument regarding the video of the Green interview that he is now making before us. In the division below, however,

3

the People conceded that Ray preserved this argument, and the division so concluded. I believe that the record fully supports the People's prior concession and the division's conclusion. As noted above, the record shows that Ray made precisely the same argument that he is making here. Accordingly, in my view, he preserved this issue for our review.

¶35 Control over the use of exhibits during jury deliberations rests firmly within the trial court's discretion, and we may not substitute our own judgment for that of the trial court. *Jefferson*, ¶ 25, 393 P.3d at 498. Accordingly, we will not disturb the court's refusal to limit the use of an exhibit unless the court's decision was manifestly arbitrary, unreasonable, or unfair. *Id.* at ¶ 25, 393 P.3d at 498–99. In affording discretion to a trial court, however, an appellate court may not abdicate its responsibility to review the trial court's determinations. *Id.* at ¶ 25, 393 P.3d at 499. A trial court abuses its discretion when it misapplies the law. *Id.*

¶36 Not every abuse of discretion, however, impairs the reliability of a conviction to a degree that requires reversal. *Id.* at ¶ 26, 393 P.3d at 499. Pursuant to Crim. P. 52(a), "[a]ny error, defect, irregularity, or variance which does not affect substantial rights" is deemed harmless and "shall be disregarded." Thus, when a defendant objects to and preserves a non-constitutional trial error, the reviewing court will overturn his or her conviction only "if the error 'substantially influenced the verdict or affected the fairness of the trial proceedings.'" *Hagos v. People*, 2012 CO 63, ¶ 12, 288 P.3d 116, 119 (quoting *Tevlin v. People,* 715 P.2d 338, 342 (Colo. 1986)).

4

## B. Applicable Law

¶37    "In this jurisdiction we have long adhered to the rule that absent a specific exclusion of some particular class of exhibits, trial courts exercise discretionary control over jury access to trial exhibits during their deliberations." *Frasco v. People*, 165 P.3d 701, 704 (Colo. 2007).

¶38    In *DeBella*, 233 P.3d at 665–69, and *Jefferson*, ¶¶ 25–62, 393 P.3d at 498–504, we considered trial courts' exercise of such discretionary control in cases involving jury access to videotaped statements of child sexual assault victims. Because I believe that these cases should control our decision here, I discuss them in some detail.

¶39    In *DeBella*, 233 P.3d at 665, the People charged the defendant with sexual assault on a child and enticement. The evidence at trial included two videotaped interviews in which the victim had described the incidents underlying the charges to a detective and to a counselor. *Id.* Parts of the first videotape and all of the second were ultimately admitted into evidence and played for the jury in open court. *Id.* At the close of the evidence, the court announced its intent to provide the jury with a television and the second videotape, thus allowing the jury unconstrained access to the second videotape during deliberations. *Id.* at 665–66. The court decided not to provide the first videotape because it had not been redacted and thus contained portions of the interview that the court had ruled inadmissible. *Id.* at 666.

¶40    Defense counsel objected to the court's plan, contending that unless the court imposed restrictions on the jury's access to the second videotape, the jury's ability to review the videotape might result in undue prejudice to the defendant. *Id.* The court

overruled this objection, relying on *People v. McKinney*, 80 P.3d 823, 829 (Colo. App. 2003), *rev'd*, 99 P.3d 1038 (Colo. 2004), in which the division had stated that pursuant to the amended C.R.C.P. 47(m), a basis no longer existed for prohibiting juror access during deliberations unless such access would be "infeasible." *DeBella*, 233 P.3d at 666 (quoting *McKinney*, 80 P.3d at 829).

¶41    The jury eventually found the defendant guilty as charged, and he appealed, arguing, as pertinent here, that the trial court had committed reversible error when it allowed the jury unfettered access to the videotape during deliberations. *See People v. DeBella*, 219 P.3d 390, 392 (Colo. App. 2009), *rev'd*, 233 P.3d 664 (Colo. 2010). Before the defendant's conviction was final, however, this court issued its decision in *Frasco*, 165 P.3d at 704, disapproving of the application of C.R.C.P. 47(m) to exhibits in criminal proceedings and clarifying that "control over the use of exhibits during jury deliberations in criminal proceedings must remain firmly within the discretion of the [trial] court." The *DeBella* division acknowledged that *Frasco* controlled but nonetheless affirmed. *DeBella*, 219 P.3d at 393–97.

¶42    We granted certiorari and reversed. *See DeBella*, 233 P.3d at 665. We began by noting that *Frasco* had not announced a new rule of law but rather had reaffirmed this court's decision in *Settle v. People*, 504 P.2d 680, 680–81 (Colo. 1972), in which we had established that trial courts retain discretionary control over jury access to trial exhibits. *See DeBella*, 233 P.3d at 666. We thus viewed the question before us as whether the trial court had abused its discretion in providing the jury with unfettered access to the videotape during deliberations. *See id.* at 665.

6

¶43 In addressing this question, we observed that because the trial court felt bound by *McKinney*, "it thought its hands [were] tied with regard to the jury's access to the tape." *Id.* at 668. As a result, we concluded that the trial court had made no determination as to whether unfettered access to the videotape at issue would prejudice the defendant and, thus, the court had abused its discretion. *Id.* at 667–68.

¶44 Turning to the appropriate remedy, we determined that the trial court's abuse of discretion was not harmless and warranted reversal of the defendant's conviction. *See id.* at 668. We based this conclusion on the facts that (1) the trial court's failure to exercise control over the jury's access to the videotape or to specify why such control was unnecessary left us with no record as to how—or even if—the jury reviewed the tape during deliberations; (2) the "nearly silent record" prevented us from determining whether the trial court had fulfilled its obligation to "observe caution" that the videotape was not used in such a manner as to create a likelihood of the jury's giving it undue weight or emphasis; (3) "the videotape was the linchpin of the prosecution's case" because it was the only complete recounting of the charged assaults; and (4) because the victim's testimony deviated from his videotaped statement, the inconsistencies "underscore[d] how central the victim's credibility was to the resolution of the trial, thus heightening the danger of providing the jury with unchaperoned access to only one side of the story." *Id.* at 668–69.

¶45 In reaching this conclusion, we rejected the People's assertion that it was speculative to presume that the jury watched the video at all, much less whether the jury gave it undue weight or emphasis. *Id.* at 668. We stated, "Where holes in the record are

7

the result of the trial court's error and pertinent inquiries on appeal are reduced to exercises in speculation, the lack of record support should not weigh against the defendant's interests." *Id.*

¶46 We reached a similar conclusion in *Jefferson*, ¶¶ 39–62, 393 P.3d at 500–04. There, we acknowledged that the trial court understood its duty to exercise discretion in determining whether to allow the jury unfettered access to a DVD of the child victim's forensic interview. *Id.* at ¶ 41, 393 P.3d at 501. The factors that the court had considered in making this determination, however, did not support a conclusion that the court had fulfilled its duty to guard against unfair or prejudicial use of the video at issue. *Id.* This was because all three factors on which the court relied were "virtually ubiquitous" in cases like the one there before us. *Id.* at ¶ 48, 393 P.3d at 502. We thus concluded that a court that measured the potential for undue emphasis by relying on those factors was likely to find all three factors present, regardless of the risk actually presented by giving the jury unfettered access to the DVD at issue. *Id.* at ¶ 49, 393 P.3d at 502. Accordingly, we determined that the trial court had abused its discretion in granting the jury unfettered access to the DVD. *Id.* at ¶ 53, 393 P.3d at 503.

¶47 The question then became whether the error was harmless. For several reasons, we could not say that it was. *Id.* at ¶ 62, 393 P.3d at 504.

¶48 First, we observed that "[t]he nature of the DVD and the significant role that it played in [the defendant's] trial only exacerbate[d] our concerns regarding the verdict and the fairness of the proceedings." *Id.* at ¶ 59, 393 P.3d at 503. In support of this conclusion, we noted that (1) the prosecution had presented no physical evidence of the

8

crime; (2) the case thus turned on the victim's allegations, which were at times inconsistent; and (3) because the video contained details that the victim could not remember when she testified at trial, the video likely served as the linchpin of the prosecution's case. *Id.* at ¶ 59, 393 P.3d at 503–04.

¶49 Second, we stated, "With unfettered access to the DVD during its deliberations, the jury was able to watch and re-watch [the victim] describe the abuse in a manner functionally equivalent to her live testimony, except with more — and more vivid — detail." *Id.* at ¶ 60, 393 P.3d at 504.

¶50 Finally, we noted that the prosecutor had told the jurors to review the DVD and to decide for themselves. *Id.* As a result, we believed that the jury was more likely to have placed undue emphasis on the DVD, particularly given the inconsistencies between the victim's recorded statement and her trial testimony and the dearth of physical evidence in the case. *Id.* We thus concluded that the jury's unfettered access to the DVD substantially influenced the verdict and fairness of the proceedings. *See id.*

¶51 In reaching this conclusion, we were not persuaded by the People's argument that the brevity of the jury's deliberations rendered any error harmless. *Id.* at ¶ 61, 393 P.3d at 504. We noted that the length of the jury's deliberations would have allowed the jurors to watch the DVD repeatedly had they wished to do so. *Id.* Moreover, we reiterated our statement in *DeBella* that when holes in the record (e.g., the absence of evidence regarding whether the jury actually watched the DVD) resulted from the trial court's error and pertinent inquiries on appeal were reduced to speculation, the lack of a record should not weigh against the defendant. *Id.*

9

## C. Application

¶52    In my view, *DeBella* and *Jefferson* are dispositive in the present case.

¶53    As in *DeBella*, the trial court relied on now-discredited principles of law in allowing the jury to have unfettered access to the video at issue. In *DeBella*, 233 P.3d at 666, the trial court had relied on the court of appeals division's opinion in *McKinney*, which was subsequently disapproved in *Frasco*, 165 P.3d at 703. In the present case, the trial court similarly relied on *Pahlavan*, 83 P.3d at 1141, and *Isom*, 140 P.3d at 104, both of which had followed *McKinney*. Accordingly, for the reasons set forth in *DeBella*, 233 P.3d at 667–68, I believe that the trial court abused its discretion in affording the jury unfettered access to the videotape of the Green interview.

¶54    The question thus becomes whether this error was harmless. Unlike the majority, I cannot say that it was.

¶55    As an initial matter, I note that I am unpersuaded by the People's argument that it is unclear whether the jurors even watched the video. In my view, the record reveals that the trial court intended for the jury to have unrestricted access to the video. The prosecution argued for such unfettered access, and the court agreed with the prosecution's argument. Moreover, the court ordered the prosecution to make the video and associated equipment available for the jurors, and the court placed no restrictions on the jurors' viewing of that video. They needed only to contact the bailiff when they wanted to watch it, and the parties appear to agree that such requests would not have been on the record. And given the prosecution's repeated reminders to the jurors that

they would have the opportunity to watch the video, I am unwilling to presume that they did not do so.

¶56     Even if there were a question as to whether the jurors had watched the video, however, as we stated in *DeBella* and reiterated in *Jefferson*, "[w]here holes in the record [e.g., the absence of evidence regarding whether the jury actually watched a video] are the result of the trial court's error and pertinent inquiries on appeal are reduced to exercises in speculation, the lack of record support should not weigh against the defendant's interests." *DeBella*, 233 P.3d at 668; *accord Jefferson*, ¶ 61, 393 P.3d at 504.

¶57     In addition to the foregoing, as was the case with the recorded interviews in *DeBella* and *Jefferson*, the video of Green's interview was important to the prosecution's case. As noted above, it appears to have been the principal evidence of Ray's intent to kill, which was an element of many of the offenses with which he was charged and of which he was convicted. Indeed, apparently acknowledging this fact, the prosecution relied heavily (and repeatedly) in closing arguments on the Green video to argue that Ray had the requisite intent.

¶58     Finally, at trial, Green had virtually no memory of the facts that he recounted in the interview, which was close in time to the incident at issue. As a result, the jury would have had to rely substantially on the Green interview to decide whether Ray had formed the requisite intent, and they were able to watch and re-watch Green describe the events at issue as if he were a witness inside the jury room, but without that testimony's being subject to cross-examination and without affording equal access to Ray's side of the story. *See DeBella*, 233 P.3d at 669 (noting that the inconsistencies between the victim's recorded

11

statement and her trial testimony underscored how central the victim's credibility was in the case, "thus heightening the danger of providing the jury with unchaperoned access to only one side of the story").

¶59    For the reasons set forth in *Jefferson*, ¶ 60, 393 P.3d at 504, the jury's ability to review the video in this way presented a substantial risk that the jury would give the video undue weight, and this risk was exacerbated by the lack of any cautionary instruction from the court and by the prosecution's reminders in closing arguments that the jury would have the opportunity to watch the video in the jury room. *See also id.* (noting that the prosecutor's request in rebuttal closing argument that the jurors watch the DVD there at issue likely resulted in the jury's placing undue emphasis on the DVD and that, given the inconsistencies between the witness's recorded statement and her trial testimony, the likelihood of such undue emphasis substantially influenced the verdict and the fairness of the proceedings).

¶60    For these reasons, I believe that the trial court's error in allowing the jurors unfettered access to the video of the Green interview was not harmless.

### III. Conclusion

¶61    In light of the foregoing, I would conclude that the trial court abused its discretion in affording the jury unfettered access to the videotape of the Green interview. Moreover, unlike the majority, I cannot say that this error was harmless. Accordingly, I would reverse the division's judgment on this point.

¶62    For these reasons, I respectfully concur in part and dissent in part from the majority opinion in this case.

12

I am authorized to state that JUSTICE HART joins in this concurrence in part and dissent in part.