21CA1934 Peo v Britton 02-20-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 21CA1934
City and County of Denver District Court No. 20CR3685
Honorable Eric M. Johnson, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Lessie Steve Britton,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division V
Opinion by JUDGE SULLIVAN
Freyre and Schock, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced February 20, 2025

---

Philip J. Weiser, Attorney General, Brittany Limes Zehner, Assistant Solicitor General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Casey Mark Klekas, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Lessie Steve Britton, appeals the judgment of conviction entered on jury verdicts finding him guilty of second degree murder, attempted first degree murder, first degree assault, and menacing.  We affirm.

## I.     Background

¶ 2     The jury heard evidence at trial from which it could have reasonably found the following facts.

¶ 3     Britton and one of the victims, Fernando Martinez-Briones, were neighbors who both used the same alleyway to access their garages.  The two had a long-running dispute over Britton's vehicles blocking the alleyway.

¶ 4     In June 2020, Martinez-Briones and one of his sons, E.M., were returning home from work but couldn't access the alleyway because Britton's vehicle blocked their path.  Martinez-Briones honked his horn to alert Britton that he was blocking the alleyway.  While Britton wasn't in his vehicle at the time, he eventually heard Martinez-Briones's horn and moved his vehicle to unblock the alleyway.  Britton noticed, however, that the Martinez-Briones didn't turn into his garage once the alleyway was clear.  Britton

1

then drove to the front of Martinez-Briones's residence and blocked his driveway.

¶ 5    Britton rolled down his vehicle's window and began to argue with Martinez-Briones and E.M. as they stood on the sidewalk. E.M. heard Britton say that he was going to shoot his father, prompting him to start recording the interaction on his phone.

¶ 6    Martinez-Briones's other son, F.M., looked out his bedroom window and could see Britton's vehicle and hear yelling. F.M. also began to record the interaction but then decided to go outside with his baseball bat. After walking out of the house, however, F.M. realized that his father, brother, and Britton were "just arguing" so he dropped the bat on the lawn before approaching Britton's vehicle.

¶ 7    As the argument escalated, Britton and Martinez-Briones began to hurl racially charged language at each other. Britton repeatedly demanded to see Martinez-Briones's green card and threatened to "find this out" by calling immigration authorities. Martinez-Briones responded by calling Britton a "[f]ucking black turkey" and "fucking [N-word]." Hearing the latter, Britton shot Martinez-Briones, who fell to the ground. E.M.'s recording captured

2

the shooting. As E.M. went to his father's aid, Britton fired a second shot, striking E.M. in his right bicep. Britton then pointed the gun at F.M. but didn't shoot. F.M. ran inside and called 911.

¶ 8 After the shooting, Britton drove himself to a police station to turn himself in. Martinez-Briones and E.M. were transported to the hospital. Law enforcement officers interviewed E.M. regarding the shooting while he received treatment. Martinez-Briones eventually died from his gunshot wound.

¶ 9 Although the prosecution charged Britton with first degree murder for killing Martinez-Briones, the jury convicted him of second degree murder. It also found him guilty of attempted first degree murder, first degree assault, and menacing.

¶ 10 Britton now appeals. He contends the district court erred by (1) admitting prejudicial video evidence showing E.M.'s hospital interviews; (2) failing to instruct the jury on Britton's right to defend himself against multiple assailants; (3) failing to correct the prosecutor's misconduct during closing argument; and (4) failing to dismiss a district court judge from the venire. Britton also contends that the cumulative effect of the court's errors requires reversal. We address each argument in turn.

## II.    Admissibility of the Video Interviews

¶ 11    Britton first contends that the district court erred by admitting three video recordings showing E.M.'s interviews with law enforcement officers.  Specifically, Britton argues that the video interviews were inadmissible because (1) they constituted hearsay under CRE 802; and (2) their probative value was substantially outweighed by their unfair prejudice under CRE 403, they were needlessly cumulative, and they amounted to improper bolstering. We perceive no abuse of discretion in the district court's decision admitting the videos.

### A.    Additional Background

¶ 12    E.M. testified during the prosecution's case-in-chief but couldn't recall certain details about the shooting.  During the direct testimony of its next witness, a responding officer, the prosecution sought to admit three videotaped interviews between law enforcement and E.M.  The videos each showed officers speaking with E.M. at the hospital while he received treatment for the gunshot wound to his bicep.  In the videos, E.M. appears with blood on his hands and arms.  The prosecutor argued that the videos were relevant, among other reasons, to show E.M.'s demeanor and

4

mental state at the time and because his "recollection [wa]s different" and more detailed in the videos.

¶ 13    After initially ruling that the videos were inadmissible, the district court reversed course and admitted the videos on several grounds, including as excited utterances under CRE 803(2). The court explained that "the foundation was laid previously that these would be excited utterances that he was still — he was in the hospital after being shot and he was still under the influence of that wound and of that event." The court also (1) ruled that E.M.'s videotaped statements were admissible as prior inconsistent statements under section 16-10-201, C.R.S. 2024, based on the supreme court's direction that a witness's actual or feigned memory loss is "tantamount to [a] denial," *Davis v. People*, 2013 CO 57, ¶ 7 n.2; and (2) overruled Britton's CRE 403 objection. The court said, however, that it would supervise any replays of the videos and wouldn't allow the jury to have "full access" during its deliberations.

B.    Standard of Review and Applicable Law

¶ 14    We review a district court's evidentiary rulings for an abuse of discretion. *People v. Hood*, 2024 COA 27, ¶ 6. A district court

abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair or when it misapplies the law. *Id.*

¶ 15 Hearsay isn't admissible unless otherwise allowed by statute or rule. CRE 802. An "excited utterance," however, falls within an exception to the rule against hearsay. CRE 803(2). An excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." *Id.*; *see, e.g.*, *People v. Martinez*, 18 P.3d 831, 835 (Colo. App. 2000).

¶ 16 Under CRE 403, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The district court may exclude evidence under this rule if, for example, the evidence has an undue tendency to suggest a decision on an improper basis, such as "sympathy, hatred, contempt, retribution, or horror." *People v. Dist. Ct.*, 785 P.2d 141, 147 (Colo. 1990). In reviewing a district court's ruling under CRE 403, we afford the evidence its maximum probative value attributable by a reasonable fact finder

6

and the minimum unfair prejudice that can be reasonably expected. *People v. Gibbens*, 905 P.2d 604, 607 (Colo. 1995). The district court enjoys "broad discretion" in balancing the probative value of the evidence against the danger of unfair prejudice. *Id.*

## C. Analysis

¶ 17 At the outset, we decline to address Britton's argument that the videos constituted inadmissible hearsay. Although Britton challenges certain grounds that the district court used to admit the videos, he doesn't challenge the court's ruling that E.M.'s statements on the videos fell within the excited utterance exception to the hearsay rule. *See* CRE 803(2). We must therefore conclude that the district court properly admitted the videos under this hearsay exception, regardless of whether the court erred on the grounds urged by Britton. *See People v. Archer*, 2022 COA 71, ¶ 42 (explaining the appellate court must affirm the trial court's admission of evidence where the appellant doesn't challenge each alternative ground for admitting the evidence).

¶ 18 Turning to Britton's CRE 403 argument, we conclude the district court acted within its broad discretion when admitting the videos. For one, the videos were probative to help explain E.M.'s

7

lack of recollection at trial and to rebut defense counsel's attempts to impeach his credibility. As one example, E.M. testified on cross-examination that he started recording the incident because he was afraid of Britton. Defense counsel then attempted to impeach E.M. by asking whether he recalled telling officers that he *wasn't* afraid of Britton. E.M. responded that he couldn't recall. One of the videos shed light on this discrepancy — it showed E.M. telling officers that he recorded the incident on his phone after Britton allegedly said, "I'm going to shoot you." While the video didn't show E.M. saying that he was "fearful" or "afraid," he explained that he felt recording the interaction was necessary "in case anything [happened]." *See People v. Tyler*, 745 P.2d 257, 259 (Colo. App. 1987) ("If the credibility of a witness is at issue, the jury should

have access to all the relevant facts, including consistent and inconsistent statements.").[1]

¶ 19   In addition, while Britton argues that the videos were prejudicial because they depicted E.M.'s overwhelming "suffering and sorrow," our review reveals that E.M. was coherent and responsive to the officer's questions.  E.M. didn't appear in significant pain and, although blood can be seen on his hands and arms, the gunshot wound to his bicep wasn't visible.  *See People v. Villalobos*, 159 P.3d 624, 630-31 (Colo. App. 2006) (concluding the trial court didn't abuse its discretion in admitting a color photograph showing the victim's head wound where the photograph wasn't "particularly shocking or inflammatory").  Moreover, while one of the videos showed E.M. becoming emotional for a few seconds, we can't say that brief portion of the video created *unfair*

---

[1] Britton alternatively disputes whether the *entirety* of the twenty-minute-plus videos was admissible under CRE 403.  But he never asked the court to redact those portions that he deemed objectionable.  To the extent Britton asserts that the court's failure to redact the videos on its own initiative constituted plain error, we disagree.  Nothing in the videos was so unfairly prejudicial that the need for redactions should have been obvious to the court absent defense counsel's request.  *See People v. Arzabala*, 2012 COA 99, ¶ 88.

prejudice that substantially outweighed its probative value. *See People v. Kembel*, 2023 CO 5, ¶ 53 ("[T]he fact that evidence is prejudicial doesn't render it inadmissible; only *unfairly* prejudicial evidence is inadmissible.").

¶ 20　　The district court also mitigated the danger of any unfair prejudice by ruling that replays of the videos must occur under the court's supervision, not in the jury room where jurors could replay the videos "over and over." *See People v. Jefferson*, 2014 COA 77M, ¶¶ 18-19 (identifying "[m]echanisms for controlling the jury's consideration of videotaped statements" to prevent "undue emphasis," including court supervision of replays), *aff'd*, 2017 CO 35. Under these circumstances, the district court didn't abuse its discretion by overruling Britton's CRE 403 objection.

¶ 21　　We also aren't persuaded by Britton's argument that the district court should have excluded the videos because they were cumulative of other evidence. As discussed, the videos were relevant to a material issue — E.M.'s memory and credibility. Thus, even if the videos were somewhat cumulative, the district court acted within its discretion by admitting them. *See Lira v. People*, 445 P.2d 62, 64 (Colo. 1968) (Evidence is admissible, even if

cumulative, if "it sheds light on a material inquiry.") (citation omitted); *see also People v. Salas*, 902 P.2d 398, 401 (Colo. App. 1994) (if the evidence is relevant and material, the trial court doesn't abuse its discretion by admitting it merely because it may be cumulative).

¶ 22     We similarly reject Britton's arguments that the videos improperly bolstered E.M.'s testimony. Bolstering occurs when a witness testifies that another witness is telling the truth on a particular occasion. *Venalonzo v. People*, 2017 CO 9, ¶ 32; *see also* CRE 608(a). None of E.M.'s statements on the videos fit that description, and Britton points us to no authority in which a court has held that a victim's videotaped interview constitutes improper bolstering.

¶ 23     Accordingly, the district court didn't abuse its discretion by admitting the videos.

### III.   Jury Instructions on Self-Defense

¶ 24     Britton next contends that the district court erred by failing to instruct the jury that Britton had the right to defend himself against multiple assailants. We disagree.

## A. Additional Background

¶ 25    As relevant here, the court provided the jury with two instructions regarding self-defense: (1) a "deadly physical force in defense of person" instruction as a defense to the first and second degree murder counts and (2) a "defense of person" instruction as a defense to the counts for attempted first degree murder, first degree assault, and menacing. Defense counsel didn't request a multiple assailants instruction. Both instructions generally tracked the pattern jury instructions in effect at the time. *See* COLJI-Crim. H:11-12 (2021). Both instructions twice told the jury, for example, that it should "consider[] all the evidence" when deciding whether the prosecution had satisfied its burden of disproving self-defense. *See id.*

¶ 26    Consistent with the pattern instructions, both instructions also directed the jury to consider the reasonableness of Britton's beliefs at the time of the shooting. Specifically, the district court's deadly physical force instruction read in part as follows:

> Mr. Britton was legally authorized to use
> deadly physical force upon another person
> without first retreating if:

12

> 1. he used that deadly physical force in order to defend himself from what he reasonably believed to be the use or imminent use of unlawful physical force by that other person, and
>
> 2. he reasonably believed a lesser degree of force was inadequate, and
>
> 3. he had a reasonable ground to believe, and did believe, that he was in imminent danger of being killed or of receiving great bodily injury.

¶ 27    Similarly, the district court's defense of person instruction read in part as follows:

> The defendant was legally authorized to use physical force upon another person without first retreating if:
>
> 1. he used that physical force in order to defend himself from what he reasonably believed to be the use or imminent use of unlawful force by that other person, and
>
> 2. he used a degree of force which he reasonably believed to be necessary for that purpose.

### B.    Standard of Review and Applicable Law

¶ 28    Britton concedes that he didn't request a multiple assailants instruction, thus limiting our review to plain error. Plain error is error that is both obvious and substantial. *Hagos v. People*, 2012 CO 63, ¶ 14. An error is obvious if it contravenes (1) a statute; (2) a

well-settled legal principle; or (3) Colorado case law. *People v. Pollard*, 2013 COA 31M, ¶ 40. An error is substantial if it so undermines the fundamental fairness of the trial as to cast serious doubt on the reliability of the conviction. *Hoggard v. People*, 2020 CO 54, ¶ 13.

¶ 29 We review a district court's decision to give or not give a jury instruction for an abuse of discretion but review de novo whether the instruction accurately stated the law. *People v. Carter*, 2015 COA 24M-2, ¶ 39. So long as the instructions accurately state the law, the district court has broad discretion in formulating jury instructions. *Id.*

¶ 30 A district court need not give a multiple assailants instruction in every case involving both multiple assailants and self-defense. *Riley v. People*, 266 P.3d 1089, 1094 (Colo. 2011). Rather, the jury must consider the totality of the circumstances — including the number of people reasonably appearing to be threatening the defendant — when evaluating whether the defendant (1) reasonably believed self-defense was necessary and (2) used reasonable force to repel the apparent danger. *Id.* (citing *People v. Jones*, 675 P.2d 9, 14 (Colo. 1984)). "The purpose of this rule is to ensure that the jury

understands that it may consider *all* relevant evidence when assessing the reasonableness of the defendant's actions." *Riley*, 266 P.3d at 1094; *accord People v. Roberts-Bicking*, 2021 COA 12, ¶¶ 27-28 (trial court's error in denying the defendant's multiple assailants instruction was cured by the court's supplemental instruction requiring the jury to consider "the totality of the circumstances").

## C.     Analysis

¶ 31     We discern no error, let alone plain error, in the district court's omission of a multiple assailants instruction. The court's instructions on deadly physical force and defense of person both instructed the jury, twice, to "consider[] all the evidence" in determining whether the prosecution had satisfied its burden of disproving these defenses. The court's instructions also told the jury to consider whether Britton used the degree of force that he "reasonably believed" was necessary and whether he had "reasonable ground" to believe that he was in imminent danger of being killed or receiving great bodily injury. *See Riley*, 266 P.3d at 1094 (upholding instruction using similar "reasonable belief" language). By doing so, the court satisfied *Riley*'s requirement to

15

direct the jury to consider the totality of the circumstances, which necessarily included the number of assailants who reasonably appeared to threaten Britton. *See id.*

¶ 32 But even if we assumed that the district court's omission of a multiple assailants instruction constituted error, it didn't so undermine the fundamental fairness of the trial as to cast serious doubt on the reliability of the conviction. The court's two self-defense instructions encompassed all charges against Britton: first and second degree murder based on Britton's fatal shooting of Martinez-Briones, as well as the counts for the attempted murder and assault of E.M. and menacing of F.M. Given these instructions, the jury would have understood that it should consider all three victims' actions when evaluating the totality of the circumstances. *See People v. Trujillo*, 83 P.3d 642, 645 (Colo. 2004) (reviewing court must consider jury instructions as a whole).

¶ 33 We aren't convinced otherwise by Britton's reliance on pre-*Riley* decisions from divisions of this court suggesting that the pattern jury instructions for self-defense are insufficient. *See, e.g., People v. Manzanares*, 942 P.2d 1235, 1240 (Colo. App. 1996); *People v. Beasley*, 778 P.2d 304, 307 (Colo. App. 1989). *Riley*

16

abrogated these cases by clarifying that a specific multiple assailants instruction isn't necessarily required so long as the district court "direct[s] the jury to consider the totality of the circumstances during its deliberations on reasonableness." 266 P.3d at 1094; *see also Roberts-Bicking*, ¶¶ 20-21 (recognizing *Riley* abrogated *Manzanares* and *Beasley*)

¶ 34    Accordingly, the district court didn't err by failing to provide a multiple assailants jury instruction.

## IV.    Prosecutorial Misconduct

¶ 35    Britton next contends that several instances of prosecutorial misconduct during closing argument require reversal.  We aren't persuaded.

### A.    Standard of Review and Applicable Law

¶ 36    "Whether a prosecutor's statements constitute misconduct is generally a matter left to the trial court's discretion." *Domingo-Gomez v. People*, 125 P.3d 1043, 1049 (Colo. 2005).  We won't disturb the district court's rulings regarding such statements absent an abuse of that discretion. *People v. Strock*, 252 P.3d 1148, 1152 (Colo. App. 2010).

17

¶ 37    With one exception noted below, all of Britton's claims of

prosecutorial misconduct are unpreserved, limiting our review to

plain error. *See People v. Leyba*, 2019 COA 144, ¶ 55, *aff'd*, 2021

CO 54. Similar to the jury instruction context, reversal under this

high standard requires that the prosecutorial misconduct be

obvious and so undermine the fundamental fairness of the trial as

to cast serious doubt on the reliability of the judgment of

conviction. *People v. Walker*, 2022 COA 15, ¶ 28. To constitute

plain error, the misconduct must be flagrant or glaring or

tremendously improper. *People v. Weinreich*, 98 P.3d 920, 924

(Colo. App. 2004), *aff'd*, 119 P.3d 1073 (Colo. 2005). Prosecutorial

misconduct in closing argument rarely constitutes plain error. *Id.*

¶ 38    When reviewing claims of prosecutorial misconduct, we

conduct a two-step analysis. *Wend v. People*, 235 P.3d 1089, 1096

(Colo. 2010). First, we determine whether the prosecutor's conduct

was improper based on the totality of the circumstances. *Id.*

Second, if the comments were improper, we evaluate whether they

warrant reversal according to the proper standard of review. *Id.*

¶ 39    In conducting this analysis, we consider the prosecutor's

questionable comments in context of the argument as a whole and

in light of the evidence before the jury. *People v. Samson*, 2012 COA 167, ¶ 30. A prosecutor is permitted to comment on the admitted evidence and the reasonable inferences that can be drawn from the evidence, employ rhetorical devices, and engage in oratorical embellishment and metaphorical nuance. *Id.* at ¶ 31. And because arguments delivered in the heat of trial aren't always perfectly scripted, we give the prosecutor the benefit of the doubt when their remarks are ambiguous or simply inartful. *Id.* at ¶ 30. However, closing arguments can't be used to mislead or unduly influence the jury. *Domingo-Gomez*, 125 P.3d at 1049. A prosecutor may not, for example, intentionally misstate the evidence, attempt to inflame the jurors' passions, or offer a personal opinion as to the defendant's guilt. *See id.*

B.    "Baiting" Comments and Misleading the Jury Regarding Heat of Passion and the Duty to Retreat

¶ 40    Britton contends that the prosecutor's theme during closing argument that Britton "baited" Martinez-Briones to use the N-word wasn't based in fact, misled the jury about his heat of passion defense, and wrongfully suggested that Britton had a duty to retreat.

¶ 41     During closing, the prosecutor stated repeatedly that Britton provoked and "baited" the victims.  The following comments are illustrative:

- "[Britton] wasn't processing that awful word.  He baited [Martinez-Briones] to use it."

- "[Y]ou can see in that video [Britton] baiting and continuing to try to instigate and escalate things."

- "[Britton] was in control and baiting them as he started to call them — threatened to call ICE, threatened to call for their green card."

¶ 42     Contrary to Britton's argument, the evidence permitted the jury to draw the inference that Britton goaded the victims into escalating the confrontation.  The record shows that Britton drove to the front of the victims' house, blocked their driveway, threatened to "find out" the victims' immigration status, and demanded to see Martinez-Briones's green card.  Given this evidence, we can't say that the prosecutor's use of "baiting" wasn't tethered to the facts.  *See Samson*, ¶ 31 (prosecutor may comment on the reasonable inferences that can be drawn from the evidence).

¶ 43    Next, Britton contends that the prosecutor misled the jury regarding his heat of passion defense by arguing (1) "[w]e have a highly provoking word," not a "highly provoking act"; (2) Britton's claim of self-defense is incompatible with heat of passion because it necessarily meant he was "calculated" and "deliberate"; (3) heat of passion doesn't apply to E.M.'s acts; and (4) "a long interaction cannot give rise to [a] heat of passion defense."

¶ 44    We fail to see how these arguments misled the jury. As to Britton's first contention, we note that the district court's heat of passion jury instruction correctly tracked Colorado law by requiring a "serious and highly provoking *act*" by the victim, not merely highly provoking words. § 18-3-103(3)(b), C.R.S. 2024 (emphasis added); *accord United States v. Frady*, 456 U.S. 152, 174 (1982) (An instruction saying, "Mere words . . . no matter how insulting, offensive or abusive, are not adequate to induce [sic] a homicide although committed in passion, provoked . . . from murder to manslaughter" was sufficient.) (alteration in original). We can hardly fault the prosecutor for making arguments that hewed closely to the jury instruction's language, particularly when the prosecutor candidly acknowledged that Martinez-Briones's use of

the N-word was "contentious, hateful," and "one of the worst words you can use."

¶ 45     As to Britton's remaining heat of passion contentions, the prosecutor was free to argue that Britton's actions failed to satisfy the requirements for a heat of passion defense, including the requirement that the defendant acted upon a "*sudden* heat of passion." § 18-3-103(3)(b) (emphasis added); *see Samson*, ¶ 31.

¶ 46     By way of example, the video of the Britton's initial gunshot that killed Martinez-Briones showed that the preceding verbal argument lasted at least one and a half minutes.  And a detective testified based on surveillance footage that ten seconds elapsed between Britton's initial shot and his second shot that wounded E.M.  According to E.M., he was on the ground applying pressure to his father's wound when Britton fired the second shot that struck his bicep.  From this, the prosecutor could reasonably argue that Britton fired both shots after deliberation following a lengthy verbal argument that gradually escalated.  *See People v. Sepulveda*, 65 P.3d 1002, 1007 (Colo. 2003) ("[C]umulative provocation is an insufficient basis for a heat of passion instruction.").  While Britton could reasonably urge the jury to draw the opposite inference —

that he suddenly snapped upon being called the N-word — the prosecutor didn't mislead the jury by arguing that Britton failed to establish his heat of passion defense.

¶ 47    Britton also argues that the prosecutor's "baiting" theme improperly implied that Britton had a duty to retreat.  He points to the prosecutor's following remarks:

- Britton "decided not to drive away but get closer to them, to get more in their face."

- "Only one man was sitting in that car with nothing in front of him, nothing behind him, and nothing on his driver's side preventing him from leaving."

- "[Britton] was not surrounded.  He was not about to be beaten up.  He was in control that entire time.  When he chose not to leave, he chose to goat [sic] them."

¶ 48    Only initial aggressors must retreat before using force in self-defense.  *Cassels v. People*, 92 P.3d 951, 956 (Colo. 2004).  As a result, a prosecutor can't argue that a defendant is barred from asserting self-defense when an unused avenue of retreat remains available, "even if offered only to attack the reasonableness of a defendant's use of force."  *People v. Monroe*, 2020 CO 67, ¶ 29.

Based on this holding from *Monroe*, which the supreme court announced shortly before the trial in this case, the district court's failure to correct the prosecutor's above remarks — suggesting that Britton should have retreated by driving away — constitutes obvious error. *See Scott v. People*, 2017 CO 16, ¶ 16 (error is obvious if it contravenes Colorado case law).

¶ 49 Nonetheless, we conclude that reversal isn't required because the prosecutor's comments didn't so undermine the fundamental fairness of the trial as to cast serious doubt on the reliability of the conviction. *See Walker*, ¶ 28. The prosecution's closing argument, including rebuttal, spanned approximately thirty-one pages of transcript. Conversely, the prosecutor's improper statements amounted to only eleven lines of text. *See People v. Salazar*, 2023 COA 102, ¶ 52 (prosecutor's improper comments didn't constitute plain error, among other reasons, because they were "fleeting" when viewed within context of closing argument as a whole). Defense counsel's failure to object also suggests that counsel believed the prosecutor's comments weren't overly damaging. *See Domingo-Gomez*, 125 P.3d at 1054.

¶ 50    Moreover, the district court correctly instructed the jury in both self-defense instructions that Britton was authorized to use physical force upon another person "without first retreating" if the prosecution failed to disprove the elements of self-defense.  And the court told the jury that it must follow the rules of law it provided, even if the attorneys commented on the rules.  Absent evidence to the contrary, we must assume the jury heeded the court's instructions.  *People v. Villa*, 240 P.3d 343, 352 (Colo. App. 2009).

¶ 51    Given all of this, we conclude the district court's failure to sua sponte correct the prosecution's comments suggesting that Britton had a duty to retreat doesn't warrant the "drastic remedy" of reversal under the plain error standard.  *Domingo-Gomez*, 125 P.3d at 1055.

### C.    Appeal to Sympathy and Inflaming the Passions of the Jury

¶ 52    Britton contends that the prosecutor committed misconduct and inflamed the passions of the jury by referring to "extremely emotional" aspects of the case.

¶ 53    Britton points, for example, to the prosecutor's remark that "[t]here's a lot of sadness in this case."  But he acknowledges that the prosecutor made this comment while highlighting the court's

instruction that sympathy, bias, and prejudice must *not* influence the jury's decision. *See* Crim. P. 30 (counsel may comment on the jury instructions during argument).

¶ 54 Even so, Britton asserts that the prosecutor went further by reminding the jury about E.M.'s request at the hospital to provide officers with additional information about Britton pointing a gun at his brother, commenting on E.M.'s "robotic" yet "[u]nderstandabl[e]" demeanor, and discussing E.M.'s embarrassment from his disfigurement and partial loss of use of his right arm.

¶ 55 These comments weren't improper when considered in the context of the prosecutor's argument as a whole. *See Samson*, ¶ 30. A prosecutor is allowed to urge the jury to draw reasonable inferences regarding a witness's demeanor and credibility. *People v. Constant*, 645 P.2d 843, 846 (Colo. 1982). Moreover, the prosecutor made her comment about E.M.'s request to provide additional information regarding his brother while summarizing the evidence showing that Britton pointed a gun at F.M., thus committing menacing. *See* § 18-3-206, C.R.S. 2024. Similarly, the prosecutor referred to E.M.'s disfigurement and accompanying embarrassment to establish that he suffered serious bodily injury — an essential

element of first degree assault. *See* § 18-3-202(1)(a), C.R.S. 2024. While the prosecutor's comments touched on E.M.'s trauma, they were properly "anchored in the evidence, not in emotion" and didn't ask the jury to "do justice" for the victims regardless of whether the jury believed the prosecution's evidence. *Salazar*, ¶ 51.

### D. Other Crimes, Denigrating Defense Counsel, and Offering Personal Opinions

¶ 56 We also reject Britton's contentions that the prosecutor committed misconduct by (1) suggesting that Britton committed other crimes by operating an illegal mechanic's business in the alleyway; (2) calling Britton's self-defense claim "laughable," thereby denigrating defense counsel; and (3) injecting her personal opinion about Britton's behavior.

¶ 57 Contrary to Britton's suggestion, the prosecutor didn't mention Britton's allegedly illegal mechanic's business to improperly suggest that Britton had bad character or acted in conformity with that character on a particular occasion. *See* CRE 404(b). Rather, the prosecutor said that the legality of Britton's business was "not an issue," "not an element here," and "not a matter you have to resolve to decide this case." Viewed in context,

the prosecutor's comments were merely an attempt to "draw the jury's focus to relevant evidence" and away from irrelevant evidence. *People v. Serra*, 2015 COA 130, ¶ 89.

¶ 58     Nor do we discern any misconduct in the prosecutor's characterization of Britton's self-defense claim as "laughable." The prosecutor said, "[I]t's laughable in the face of [the] video; that the defendant was scared. He didn't look scared at all. He didn't look like he was in fear." Considering the statements together, they served as a comment on the evidence and the strength of Britton's theory of the case, not as a personal attack on defense counsel. *See People v. Iversen*, 2013 COA 40, ¶¶ 37-38 (rejecting a similar challenge to the prosecutor's use of "laughable").

¶ 59     We also don't interpret any of the prosecutor's remarks as offering her own personal opinion about Britton's guilt. The prosecutor said: (1) "I just want to walk you through the prosecution's belief as to each of the verdict forms"; (2) Britton's behavior on the video "is textbook behavior of knowingly"; and (3) "[Y]ou should automatically, after consideration, reject" reckless manslaughter. In her first statement, the prosecutor prefaced the term "belief" with "the *prosecution's* belief," making clear that she

wasn't conveying her own personal opinion as to Britton's guilt but simply expressing the prosecution's position that the evidence was sufficient to support convictions on the charged counts. *See People v. Seller*, 2022 COA 102, ¶ 26, *aff'd on other grounds*, 2024 CO 64. And the prosecutor properly buttressed her final two statements with descriptions of the evidence that the prosecution alleged proved that Britton acted knowingly. *See id.* at ¶ 24 (prosecutor's use of phrases to "summarize the evidence presented" and draw reasonable inferences from that evidence didn't convey her personal opinion); *see also Samson*, ¶ 31 (prosecutor may employ oratorical embellishment).

### E. Misstatement of Facts

¶ 60 Britton contends that the prosecutor committed misconduct by misstating several facts during closing argument. He challenges six specific statements. We address each in turn.

¶ 61 "Final argument may properly include the facts in evidence and any reasonable inferences drawn therefrom." *Domingo-Gomez*, 125 P.3d at 1048.

### 1. Statement 1

¶ 62 In the first challenged statement, the prosecutor said, "Because I can. That's the defendant's mentality. That's why he shot . . . Martinez-Briones. Because I can." In the video of the shooting, Britton can be heard saying, "Because I can," in response to Martinez-Briones yelling, "Stay away from the fucking street," and "I'm tired of your fucking shit." Based on this evidence, the prosecutor could reasonably urge the jury to infer that Britton's cavalier mentality towards the alleyway dispute pervaded the entire interaction, including the shooting. *See Samson,* ¶ 31.

### 2. Statements 2 and 3

¶ 63 In the second challenged statement, the prosecutor said, "Vile words, but very clear that nobody else had any weapon there, and nobody was a real threat to [Britton]." And in the third she said, "And this here, this bat, the defense admitted, doesn't have to do with anything. The defendant never said he saw that bat. The bat was dropped. Nobody ever saw it. Another distraction from the compelling evidence that you have here."

¶ 64 Britton argues that these statements inaccurately implied that none of the victims possessed weapons during the dispute, even

30

though F.M. testified that he grabbed a baseball bat as he walked out of his house. But F.M. also testified that he dropped the bat on the front lawn as he made his way towards Britton's vehicle because he saw that Britton and his father "were just arguing." F.M.'s testimony is consistent with other evidence. The video of the shooting briefly shows F.M. standing near his father with only a phone in his left hand. Further, Britton testified that he saw F.M. standing behind his vehicle with a "silver thing" in his hand. The bat that defense counsel admitted into evidence was black and lime green.

¶ 65 Given this evidence, the prosecutor's statements didn't constitute a misstatement of the facts in evidence. *See Domingo-Gomez*, 125 P.3d at 1048.

### 3. Statement 4

¶ 66 Britton argues that the fourth statement, "[Britton] knows how to kill," wrongfully implied that he had experience killing people. But Britton omits important context from the prosecutor's two immediately preceding statements: "Again, [Britton] admitted he's armed. He's shot since he was 9." *See Samson*, ¶ 30 (the court evaluates alleged prosecutorial misconduct in the context of the

31

argument as a whole).  And Britton himself testified that he previously served in the military, received training on how to use guns, had carried a gun for twenty-two years, and learned to shoot when he was nine years old.  Based on this testimony, the prosecutor could reasonably ask the jury to find that Britton possessed the gun skills necessary to shoot and kill someone.

### 4.    Statement 5

¶ 67    In Britton's fifth challenged statement, the prosecutor asked, "Was [Britton] trying to ensure that . . . Martinez-Briones was dead, or was he trying to kill [E.M.], a person that he now knows has recorded the incident?"  Britton argues that this statement is nothing more than speculation that he shot E.M. to destroy the video evidence.  But again, Britton leaves out important context.  Immediately before this statement, the prosecutor asked rhetorically, "What was [Britton] trying to do?  That's another thing we don't have to prove is why."  Considered together, these statements didn't constitute misconduct.  A prosecutor may properly provide guidance to jurors during closing argument regarding evidence and issues that are red herrings or otherwise unessential to the elements of the offense.  *See Domingo-Gomez,*

125 P.3d at 1048 (Counsel may "point to different pieces of evidence and explain their significance within the case.").

¶ 68    In any event, a defendant's motive, while not an essential element, may be relevant to show their intent at the time of the alleged offense.  *See, e.g.*, *People v. Villanueva*, 2016 COA 70, ¶ 55. Here, the prosecution elicited evidence that E.M. posed no danger to Britton but rather was on the ground tending to his father's wound when Britton shot him in the bicep.  The prosecutor could therefore reasonably ask the jury to infer that Britton shot E.M. either in retaliation for recording the incident or as part of an attempt to destroy the video evidence, not in self-defense.  *See Samson*, ¶ 31.

### 5.    Statement 6

¶ 69    Lastly, Britton challenges a sixth statement in which the prosecutor said, "One thing I want you to think about is that testimony that you heard from the defendant.  I knew I was wrong. He knew he was not justified, didn't have any regret or remorse. Instead, what you hear is, oh, he didn't just look like he was Mexican, he was Mexican, and I know he was illegal."

¶ 70    Britton argues that the prosecutor made this statement to exploit Britton's remorse and argue that he expressly admitted his

guilt. Unlike his challenges to the prosecutor's other statements, Britton preserved this argument through a timely objection.

¶ 71 Britton testified that he voluntarily drove to the police station to turn himself in after the shooting because he "knew [he] was wrong," and "[t]here was no doubt about that." When asked on cross-examination whether he requested to see the victims' green cards because they were Mexican, Britton responded, "No. They are Mexicans," and "[t]hey didn't look like nothing. . . . I called them — that's what they were. They were Mexicans." Britton also testified that individuals born in other countries "don't earn the right to call me the [N-word]."

¶ 72 Because Britton voluntarily testified, we perceive no misconduct in the prosecutor's comments. When a defendant chooses to testify, the prosecutor is permitted in closing argument to urge the jury to draw reasonable inferences from their testimony, just like that of any other witness. *See People v. Rogers*, 68 P.3d 486, 492 (Colo. App. 2002) ("A defendant cannot have it both ways. If he talks, what he says or omits is to be judged on its merits or demerits." (quoting *United States v. Goldman*, 563 F.2d 501, 503 (1st Cir. 1977))). The prosecutor therefore could reasonably argue,

based on Britton's testimony, that (1) he drove to the police station because he knew he was wrong to shoot Martinez-Briones and E.M.; and (2) he harbored resentment towards the victims, rather than remorse, due to their immigration status and Martinez-Briones calling him the N-word.

### F.   References to Racially Charged Language

¶ 73   Britton contends that the prosecutor committed misconduct by (1) saying Britton was the "first to throw" a racial slur despite no evidence to that effect and (2) equating Martinez-Briones's use of the N-word with Britton's statements about the victim's immigration status.

¶ 74   At a threshold matter, we note that the record confirms that both Britton and the victims used racially charged language during their argument.  But there is at least some evidence from the video suggesting that Britton was the first to inject the issue of race into the dispute.[2]  Britton said, "Let me find out," and "We're going to find this out," near the beginning of the video, which Martinez-

---

[2] We use the term "race" here expansively to encompass biases based on race, ethnicity, and national origin, while acknowledging that Britton's comments were primarily based on the victims' national origin.  *See People v. Ojeda*, 2022 CO 7, ¶ 1 n.1.

Briones clearly interpreted as a threat that Britton would call immigration authorities. Martinez-Briones subsequently yelled at Britton, "You started first — you started first."

¶ 75 Even assuming, however, that Britton didn't intend his initial statements to convey a racially charged threat, the prosecutor's comment that Britton was the "first to throw" a racial slur wasn't so egregious that it undermined the fundamental fairness of the trial as to cast serious doubt on the reliability of the conviction. *See Walker*, ¶ 28. Britton repeatedly demanded that Martinez-Briones provide his green card and said, "Let me check you out," implying that he wanted to verify Martinez-Briones's immigration status. When coupled with Britton's own testimony about the victims' immigration statuses, the prosecutor could reasonably argue that Britton acted out of anger and racial animus rather than self-defense. Under these circumstances, we fail to see how the prosecutor's isolated comment that Britton instigated the racially charged insults, even if incorrect, might cast doubt on the reliability of the conviction. *See People v. Raehal*, 971 P.2d 256, 259 (Colo. App. 1998) (concluding error wasn't plain where the prosecutor's "improper remark was not repeated").

36

¶ 76    We also aren't persuaded that the prosecutor committed misconduct by equating Britton's green card remarks with Martinez-Briones's use of the N-word.  The prosecutor asked the jury, "Why is a man asking another man about his green card other than to make them feel less than.  That is a hurtful thing to do. . . . [I]t is just as deplorable to use the N word."

¶ 77    We recognize, and don't mean to understate, the highly offensive nature of the word used by Martinez-Briones and its unique ability to evoke "a history of racial violence, brutality, and subordination."  *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1116 (9th Cir. 2004).  The prosecutor conceded as much, calling the word hateful, contentious, and one of the "worst words" a person can use.  But Britton's demands for Martinez-Briones's green card were also reprehensible.  And while the prosecutor's attempt to compare one racist insult to another may have been perilous and inartful, counsel is permitted to comment on the evidence admitted at trial, including the defendant's own words.  *See Samson*, ¶ 31; *cf. Rogers*, 68 P.3d at 492.

¶ 78    Accordingly, we reject Britton's contentions that the prosecutor committed reversible misconduct.

## V. Refusal to Dismiss a Judge from the Venire

¶ 79    Britton next contends that the district court erred during jury selection by refusing to dismiss another district court judge from the venire after the parties mutually agreed that the court should dismiss her. We disagree.

¶ 80    During jury selection, the parties approached the bench and informed the court that "the parties were in agreement" that it should release the judge from the venire. The court responded that the judge hadn't "claim[ed] hardship" and that the parties' agreement to release her didn't constitute a challenge for cause. Defense counsel never challenged the judge for cause but rather elected to exercise a peremptory strike to excuse her.

¶ 81    We review a district court's decision to release or not release a potential juror from the venire for an abuse of discretion. *Cf. People v. Clemens*, 2017 CO 89, ¶ 13 (appellate court reviews the district court's ruling on a challenge for cause for an abuse of discretion).

¶ 82    To the extent Britton contends that the district court should have dismissed the judge for cause, we conclude Britton waived this claim. Waiver is "the *intentional* relinquishment of a *known* right or privilege." *People v. Rediger*, 2018 CO 32, ¶ 39 (citation omitted). A

waiver may be implied when the defendant "engages in conduct that manifests an intent to relinquish a right or privilege or acts inconsistently with its assertion." *Forgette v. People*, 2023 CO 4, ¶ 28. Waiver extinguishes error, including appellate review of the alleged error. *Id.* at ¶ 30; *see also* Crim P. 24(b)(2) (challenges to the "qualifications and competency of the prospective jurors" are waived if not raised before the jurors are sworn); *Richardson v. People*, 2020 CO 46, ¶¶ 25-26, 30 (defendant waived challenge to judge's wife serving on jury by deliberately choosing not to challenge her).

¶ 83    Defense counsel never challenged the judge for cause, even after the district court informed the parties that it didn't view their mutual agreement as a proper challenge for cause. Defense counsel also demonstrated that she understood the court's ruling by saying, "[S]ometimes there's agreements that a person may not be a proper fit," but "[i]t's not always challenged for cause statutorily." After the court declined to excuse the judge based on the parties' agreement, defense counsel opted to excuse her by exercising a peremptory strike. Thus, because Britton was aware of the opportunity to

challenge the judge for cause but never did so, we conclude Britton waived his claim. *See id.*

¶ 84 To the extent that Britton argues that the district court should have accepted the parties' mutual agreement to excuse the judge, we aren't persuaded. During the jury selection process, counsel may attempt to excuse a prospective juror by either challenging the juror for cause, § 16-10-103, C.R.S. 2024, or exercising a peremptory challenge, § 16-10-104, C.R.S. 2024. No third option exists, and we decline to judicially create one based on the parties' mutual agreement in this case. Doing so would undermine citizens' ability to serve on a jury when they are otherwise statutorily eligible. *Cf. Powers v. Ohio*, 499 U.S. 400, 407 (1991) ("[W]ith the exception of voting, for most citizens the honor and privilege of jury duty is their most significant opportunity to participate in the democratic process.").

¶ 85 Accordingly, the district court didn't abuse its discretion by declining to excuse the judge from the venire based on the parties' agreement.

## VI.  Speaking Spanish at Sentencing

¶ 86    Britton next contends that the district court erred by speaking Spanish for a portion of the sentencing hearing, thus violating both his right to be present and his right to due process.  We discern no plain error requiring reversal.

### A.  Additional Background

¶ 87    During sentencing, the district court spoke in Spanish at three different points.  Britton asserts that the court spoke in Spanish to the victims and their family, and the People agree with that interpretation of the transcript.  But the transcript doesn't indicate what was said or whether the court was merely translating what it had just spoken in English into Spanish.  The transcript says only "Spanish-Speaking."  The court spoke in English, however, when speaking directly to Britton and when explaining the reasons for its sentence.

¶ 88    Britton didn't object or request an interpreter.  Nor did defense counsel on appeal request to settle the record to determine what the court had said in Spanish.  *See* C.A.R. 10(g)(1).

41

## B. Standard of Review and Applicable Law

¶ 89 "A defendant has a right to be present at every critical stage of a criminal trial." *People v. Wingfield*, 2014 COA 173, ¶ 17. This includes sentencing. *People v. Hernandez*, 2019 COA 111, ¶¶ 22, 24; *see also* Crim. P. 43(a) ("The defendant shall be present" at the "imposition of sentence."). A defendant's inability to understand the language spoken by the court may abridge their right to be present. *See People v. James*, 937 P.2d 781, 783 (Colo. App. 1996). The appointment of an interpreter is therefore "crucial to safeguarding the fundamental fairness of the trial." *People v. Avila*, 797 P.2d 804, 806 (Colo. App. 1990). Without it, the trial proceedings become "but a 'babble of voices' and [the] defendant is but an 'insensible object' who passively observes in complete incomprehension." *Id.* at 805 (quoting *United States ex rel. Negron v. New York*, 434 F.2d 386, 388-89 (2d Cir. 1970)).

¶ 90 We review de novo whether the district court violated a defendant's constitutional right to be present. *Wingfield*, ¶ 13. However, because Britton didn't object or request an interpreter, we will reverse only if Britton demonstrates plain error. *See People v. Chavez*, 2012 COA 61, ¶ 13.

## C. Analysis

¶ 91    The People don't defend the district court's actions but rather argue that its decision to speak in Spanish didn't rise to plain error. Given the People's position, we will assume without deciding that the court erred by speaking in Spanish during sentencing and proceed to evaluate whether the error amounted to an obvious error that so undermined the fundamental fairness of the proceeding as to cast doubt on the reliability of the convictions. *See People v. Vigil*, 251 P.3d 442, 447 (Colo. App. 2010) ("[W]e need not decide whether the court actually erred if it is clear that the alleged error was not obvious."); *see also Galvan v. People*, 2020 CO 82, ¶ 45 (summarizing party presentation principle).

¶ 92    Even giving Britton the benefit of this assumption, however, we don't perceive plain error that warrants reversal. As to the obviousness of the error, Britton point us to no Colorado case law, and we've located none, holding that a trial court errs when it speaks to victims or their family in their native language during a portion of the sentencing hearing while still speaking in English when imposing its sentence and providing its reasoning. *See Scott,* ¶ 17 ("[A]n error is generally not obvious when nothing in Colorado

43

statutory or prior case law would have alerted the trial court to the error.").

¶ 93      We also fail to see how the district court's decision to speak in Spanish to the victims and their family so undermined the fairness of the proceeding as to cast doubt on the reliability of the conviction. The court spoke in English both when speaking directly to Britton and when providing its reasons for its sentence. *See People v. Watkins*, 613 P.2d 633, 637 (Colo. 1980) (sentencing court must state "the basic reasons" for its sentence, although the "reasons need not be lengthy").

¶ 94      While the record before us doesn't reveal whether the court provided *additional* reasoning for its sentence when it spoke in Spanish, the burden fell to Britton to supply an adequate record for our review, including by seeking to settle the record in the district court if necessary. *See* C.A.R. 10(g)(1); *People v. Duran*, 2015 COA 141, ¶ 12. Absent such a record, we decline to presume that the court provided additional reasoning for its sentence in Spanish. *See LePage v. People*, 2014 CO 13, ¶¶ 15-16 ("According to the presumption of regularity, appellate courts presume that the trial judge did not commit error absent affirmative evidence otherwise,"

44

and "[t]he effect of this presumption is that the party asserting error must affirmatively show that it occurred.").

¶ 95    Accordingly, the district court didn't plainly err when it spoke in Spanish to the victims and their family during a portion of the sentencing hearing.

## VII.    Cumulative Error

¶ 96    Britton contends that the cumulative effect of the district court's errors requires reversal.  The cumulative error doctrine requires reversal when "the cumulative effect of [multiple] errors and defects substantially affected the fairness of the trial proceedings and the integrity of the fact-finding process."  *Howard-Walker v. People*, 2019 CO 69, ¶ 24 (alteration in original) (quoting *People v. Lucero*, 615 P.2d 660, 666 (Colo. 1980)).

¶ 97    We have found one error in the district court's failure to correct a misstatement during the prosecutor's closing argument and assumed one other possible error during sentencing for purposes of our plain error analysis, finding both nonprejudicial. We conclude that these errors, either alone or together, didn't substantially affect the fairness of Britton's proceedings or the integrity of the factfinding process.  *See People v. Vialpando*, 2022

45

CO 28, ¶¶ 40-46 (finding five errors viewed in the aggregate didn't constitute cumulative error that deprived the defendant of a fair trial).

## VIII. Disposition

¶ 98    We affirm the judgment.

JUDGE FREYRE and JUDGE SCHOCK concur.